## Sam Cole v. The State.

### No. 2523. Decided June 17, 1903.

**1.—Murder—Manslaughter—Self-Defense—Charge.**

On a trial for murder, where it appeared that deceased was seeking to take defendant's wife and child from him to prevent him from carrying them away from his (deceased's) house, who was the wife's father; and upon his attempting to do so appellant shot and killed him, the provocation was such as to require a pertinent charge upon manslaughter. And if in preventing deceased from taking his wife and child from him defendant was put in danger of death or serious bodily injury, then his killing deceased would be justifiable homicide in self-defense, and it was error to refuse instructions embracing these principles of law.

**2.—Same—Evidence—Bloody Clothing.**

On a trial for murder, where it was admitted that defendant killed deceased, it was error to permit the bloody clothing of deceased to be exhibited to the jury, when it explained no fact and was relevant to no controverted issue the nature of the wound, its character and everything connected with it having been clearly proved and without controversy. The admission of the bloody clothing under such circumstances could serve no purpose except to inflame the minds of the jury against defendant. Such evidence is only ad-

     45 Crim.—15.

missible to explain some fact, or when relevant to some controverted issue in the case.

### 3.—Same—Evidence as to Deceased's Physical Condition.

On a trial for murder, it was permissible for the State to show, as bearing upon the relative strength of the parties, that deceased, who was the larger party, was not in his usual health and strength; but this could not be proved by conversations and expressions of opinions of third parties in the absence of defendant, and which were of a hearsay character.

### 4.—Same—Letters as Evidence.

On a trial for murder, where the evidence was that defendant killed his wife's father, who was attempting to prevent him from taking his wife and child away from her father's house; and when the State attempted to show that the wife did not love her husband and was voluntarily remaining away from him and refusing to live with him, it was competent for defendant to show his wife's love and affection for him by her letters written to him the preceding spring when he was away from her, in another county.

### 5.—Same—Defendant's Declarations.

Defendant's declarations to a witness immediately after leaving the scene of the shooting, to the effect that he had shot deceased, and would be glad for witness to go down and get him a doctor and give them assistance, was res gestae and admissible.

### 6.—Same—Flight—Rebutting Evidence.

On a trial for murder, where the State relied upon certain testimony to show flight and evasion of arrest by defendant, he should have been permitted to prove in rebuttal that he was endeavoring to go to the county seat to surrender, and was arrested the following morning at a house on the road where he had stopped for the night on account of high water.

### 7.—Same—Evidence—Conversation of Parties.

A conversation between defendant's wife and his mother-in-law in the absence of defendant, and when he was seen rapidly returning, after he had shortly before driven away, in which they expressed fear that he would kill the mother-in-law, was clearly inadmissible.

Appeal from the District Court of Brown, on a change of venue from Coleman County. Tried below before Hon. John S. Goodwin.

Appeal from a conviction of murder in the second degree; penalty, eight years imprisonment in the penitentiary.

Appellant was charged by the indictment with the murder of C. C. Hudson, on the 29th day of June, 1902, by shooting him with a gun.

Deceased was the father-in-law of appellant. The record is very voluminous, but the important facts connected with the killing are sufficiently stated in the opinion.

I. J. Rice, Chas. Sparks, and Woodward & Baker, for appellant.— After defendant had admitted the killing—that deceased was shot where the State contended he was shot; admitted the clothes tendered as evidence were the clothes that deceased had on at time of the killing— there could not have been any reason for exhibiting the bloody clothes to the jury as evidence save and except for the purpose of riling the passion and prejudice of the jury against the defendant. And we submit that it is patent on its face and a self-evident proposition that under the circumstances the evidence was clearly inadmissible and prejudicial to the rights of the defendant. What was the purpose of this evidence? Appellant admitted the killing; admitted he shot dedeceased where the State contended he was shot; that the clothes were the clothes that deceased had on at time of the killing; it was not a

case of circumstantial evidence and defendant denying the killing; then there can be no excuse, we take it, for the State insisting on exhibiting these bloody clothes to the jury in order to prove any legitimate fact.

The court erred in excluding three letters offered by defendant and written by defendant's wife to him while he was at San Angelo, Texas, directed to him at said town of date respectively March 12, 15 and 30, 1902, which letters were offered for the purpose of showing the affection defendant's wife maintained for him and her expressed desire to go and live with him, and in rebuttal of the testimony offered by the State to the effect that defendant's wife did not love him, and that she did not wish to live with him, that defendant and his wife had separated of their own accord two or three times. White's Code Crim. Proc., art. 697, subdiv. 7; Dodson v. State, 70 S. W. Rep., 969.

The court erred in not permitting defendant to prove by witness Mask what the defendant told him shortly after the homicide as a reason for killing Hudson, and where he (defendant) was going, and requesting witness to go to the home of deceased and render all the assistance necessary, for the reason that the evidence tendered would have shown that same was res gestae. Russell v. State, 11 Texas Crim. App., 291; Comers v. State, 23 Texas Crim. App., 66; Craig v. State, 30 Texas Crim. App., 621; Castillo v. State, 31 Texas Crim. Rep., 152.

The court erred in refusing to give special charge number 1 offered by the defendant, which was in effect instructing the jury that if they believed from the evidence that the defendant was endeavoring to take his wife and child away from the premises of the deceased with the consent of his wife, and if at the time of the homicide defendant had reason to believe that deceased was endeavoring to deprive him of their custody, defendant had a right to use such force as was reasonably necessary to prevent deceased from depriving him of the possession of his wife and child even to the extent of taking his life, if necessary. And that the jury might take into consideration the relative sizes and strength of the parties and all the surrounding circumstances. The husband has the right to the possession of his wife and child and to fix their domicile without the interference of anyone, so long as they live together as husband and wife. State v. Deaton, 93 Texas, 246; 15 Am. and Eng. Enc. of Law, 2 ed., p. 812, secs. 3, 5; Meirs v. State, 34 Texas Crim. Rep., 161; White's Code Crim. Proc., sec. 801, subdiv., p. 517; White's Code Crim. Proc., sec. 797.

The court erred in refusing to give defendant's special charge number 3, which is to the effect that defendant had a right to carry away from the premises of the deceased his wife and child, and that if at the time of the homicide deceased was making an effort to kill the defendant or to do him serious bodily harm, or that if defendant had reason to believe that deceased was about to assault or kill him, as viewed from the standpoint of defendant alone, defendant had a right to kill

deceased, the same being the law applicable to this case and not covered in the general charge.

Defendant proposed to testify that he met witness Mask about one and one-fourth mile from the place of the killing; that it had not been over ten minutes from the time of the killing, and that his mind was greatly agitated and that he was scared nearly to death; told witness to go down to deceased and do all he could for him, and that he was forced to shoot him; which evidence was by the court not permitted to go to the jury.. Craig v. State, 30 Texas Crim. App., 619; Castillo v. State, 31 Texas Crim. Rep., 145; Miller v. State, 31 Texas Crim. Rep., 609.

Evidence upon part of the State showing flight, the defendant has the right to rebut same by any evidence to the contrary. Lewallen v. State, 33 Texas Crim. Rep., 412; Arnold v. State, 9 Texas Crim. App., 435.

The court erred in permitting the witness Mrs. Hudson to testify what defendant's wife told witness relative to defendant shooting witness, and reply of witness to the effect that "though .he shoots my brains out I will not leave," and in permitting said witness to testify as to the condition and appearances of defendant's wife just after the homicide, for the reason same was immaterial, irrelevant, called for a conclusion, prejudicial and hearsay evidence.

Mrs. Hudson testified that after the shooting the defendant left and in a few minutes returned, and that when defendant's wife saw him coming she said, "Run, mamma, and hide; he will shoot you, for he said he would;" and she remarked, "Though he shoots my brains out I will not leave," etc. Evers v. State, 31 Texas Crim. Rep., 318; Reeves v. State, 7 Texas Crim. App., 276; 34 Texas Crim. Rep., 441.

The court erred in failing to give a correct charge on manslaughter as applied to the facts of this case, in effect as follows: That if the jury believed that at the time of the homicide the defendant had reason to believe that the deceased was making an attempt to take away from defendant his wife and baby, and that such act and belief so enraged the mind of the defendant as to render him incapable of cool reflection, and that he (defendant) was not acting in his own self-defense at the time, then you will find the defendant guilty of manslaughter, as same appears from defendant's motion for a new trial. Miers v. State, 34 Texas Crim. Rep., 161; White's Code Crim. Proc., sec. 801, subdiv. 2, p. 517; White's Code Crim. Proc., sec. 797; Young v. State, 55 S. W. Rep., 331.

*Howard Martin,* Assistant Attorney-General, for the State. [No briefs for State found with the record.—Reporter.]

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree and his punishment assessed at confinement in the penitentiary for a term of eight years.

The killing occurred in Coleman County, and the trial took place in Brown County, on change of venue. The record is unnecessarily voluminous. There is a great deal of reiteration in the facts; and the pleadings and other documents used on the trial are repeated in the transcript. This court has frequently condemned this manner of making up transcripts, and there is no apparent reason why such thing should occur. The evidence discloses one of those sad pictures thrown on the canvas so often occurring in family relations. Appellant had run away with and married the daughter of deceased, which very greatly angered deceased and his wife, and a great deal of talk pro and con was indulged in consequence of this marriage. This marriage and subsequent events brought a great many unpleasant scenes and incidents, resulting in several partial estrangements and separations of appellant and his wife. It is claimed by appellant that these matters were brought about by the acts and conduct of deceased and his (deceased's) wife; that deceased had driven appellant from his home more than once, where he and his wife were at different times residing. It seems from the testimony that deceased was fitful and arbitrary at times in his conduct towards appellant, growing out of the fact that appellant was an unwelcome son-in-law, that he had threatened his life if he undertook to carry his (appellant's) wife from the home of deceased; that for some time prior to the homicide the wife of appellant had been at the home of her father (deceased) and about two months prior to the tragedy had there given birth to a child; that by the acts and conduct of deceased and his wife, the wife of appellant was fitful in her mood, sometimes vowing intense love and fidelity to her husband in her affections, and at times siding with her father and refusing to live with or have anything to do with her husband. It is also made to appear that the wife of appellant was afraid to live with her husband or to go away from home with him, on account of the acts, conduct and language of her father. That from about the time of the birth of the child until the tragedy, appellant had been with his wife at the home of deceased, but he and his wife had determined to leave and live to themselves. It was understood by appellant and his wife that in that event it would be necessary to stealthily leave the father's home; that the father would not permit such leaving if aware of it. On the day of the killing, which was Sunday, deceased and his wife had driven away into a pasture, and while they were gone appellant and his wife decided to leave home to avoid complications and trouble. To that end he hitched a team to the buggy, and was in the act of driving away from the premises, when deceased and his wife suddenly reappeared. Because of the threats of deceased, and in order to avoid being shot, appellant took the gun of deceased and had it in the buggy with him. This was done because his wife had stated she was afraid to leave with him for fear her father would kill him. Appellant testified that when his father-in-law and mother-in-law started away to the pasture, he suggested to his wife that it was as good an oppor-

tunity as they would ever get to leave. The wife made no reply to this, and he continued to walk with her awhile, and she began crying, and he inquired the reason. She stated: "I am just scared to death; I am just simply afraid to leave." Appellant replied: "We will just have to take the chances; you know we will never have another minute's peace as long as we stay here." And after talking awhile, the wife replied: "I will risk it." Appellant hurried off to the barn, hitched the team to the buggy, and when he came back to the house for his wife she had made no preparation to leave. He said to her: "For God's sake, get ready as soon as you can." She jumped up then and ran into the little room, where appellant had a grip. He ran in and put some clothes in the grip, ran and threw it in the buggy and came back. His wife remarked to him: "Sam, I am just simply afraid to go." He said: "We will just have to take our chances." She replied: "I am afraid papa will overtake us and kill you." Appellant replied: "I am going to take the gun," and got the gun and set it in the buggy, while she was getting some of the baby's clothes out of the closet. Just as they were getting in the buggy, they looked around and discovered deceased and his wife approaching. They were about twenty-five feet distant; and while appellant and his wife were getting in the buggy, deceased and his wife drove up. Mrs. Hudson remarked: "Well, where do you all think you are going?" Appellant replied: "We are going up to the Cove." Deceased said: "I don't know whether you are or not." Deceased and his wife jumped out of their buggy and started toward appellant and his wife. Then came a scuffle between Mrs. Hudson, appellant's wife, and appellant, over the gun. Appellant was holding the baby, and when the scuffle began he laid it down as quick as he could and grabbed the gun. Deceased by this time was right up behind his wife, grabbing at the gun, and appellant said: "For God's sake, don't do that; stop, stop." Deceased continued grabbing the gun, and appellant jerked it loose from his wife and Mrs. Hudson, and shot. The horses broke to run in a northerly direction, and appellant finally succeeded in stopping them. His wife then got out and started back toward where deceased and wife were. Deceased continued approaching appellant, and came a few steps, and turned and went the other way; and after going four or five steps, turned around facing appellant and started back toward him, and after taking two steps, threw his hands to his breast and sank down. Mrs. Hudson remarked to appellant: "You have shot my husband," and he replied: "Mrs. Hudson, you know I had to do it." Appellant drove a short distance up the hill, turned around, and went back to his wife, and requested her to go with him. Mrs. Hudson spoke up, and said: Don't take her off." Appellant replied: "Mrs. Hudson, I hate to leave her." And she said: "You are not going to take her off." Appellant's wife said: "Sam, I hate to leave;" and appellant replied: "Well, I won't take you, then; I will get somebody to come just as quick as I can," and turned and drove off. Deceased was a man weighing some 170 or

180 pounds, about 45 years of age, a stout, healthy, robust man, except, perhaps, ·he had been suffering a little while before his death from an injury received from the kick of a horse. Appellant weighed from 115 to 125 pounds, and was not a healthy or vigorous man. It would be unnecessary to go into a detailed statement of all the troubles, criminations and recriminations and threats testified as having been made by deceased against appellant, and the numerous troubles that were brought about by reason of these facts between appellant and his wife. It is evident that his married life had not been strewn with roses. The State met this view of the case by showing that on occasions deceased had assisted appellant financially and otherwise, and had manifested evidence of kindness. These matters, pro and con, were spasmodic, and at intervals. There is no question upon either side of the fact that appellant and his wife thought it incumbent upon them to stealthily leave the home of deceased for fear of serious troubles if appellant undertook to carry his· wife away.

The court gave a charge on manslaughter, which was rather stereotyped in form, in which he informed the jury, in general language, that they might look to all the facts and circumstances occurring between the parties in order to determine the condition of appellant's mind at the time of the homicide, and if they believed from those facts and circumstances that his mind was rendered incapable of cool reflection, appellant was entitled to a verdict of manslaughter. The court also gave a charge, in the usual language, on self-defense, predicated upon the theory that appellant may have been afraid of his life or bodily injury at the hands of deceased. Exceptions were reserved to the general charge, and special instructions requested to submit directly and pertinently the issues of self-defense and manslaughter, as appellant claims were made apparent from the facts adduced. In other words, appellant's insistence· along this line was that, in regard to manslaughter, if deceased was seeking to take appellant's wife and child from him to prevent him carrying them away, and was approaching him for that purpose, and was in the act of doing so, and he shot and killed to prevent this, it would be manslaughter. This would be such provocation as would require a pertinent charge on manslaughter; and if it was necessary to prevent deceased from taking the wife and child, and if preventing this he was in danger of death or serious bodily injury, then it would be justifiable homicide. The same principles would govern under these circumstances as in case of illegal arrest and subject to the same limitations; and appellant would have the same right to kill as would his wife if she were resisting the alleged arrest or attempt to detain her. We believe these phases of the law should have been directly and pertinently submitted. Appellant had the legal right to the company and· custody of his wife and child, and deceased had no authority to prevent it. If it was necessary to kill deceased in order to prevent deceased killing him or taking his wife and child from him, and thus endangering him in life or serious injury, he would be justi-

fied; that is, he could repel force with force until the attempted wrong
was prevented; and if this resulted in death of deceased, appellant
would be justified; but if he was infuriated to such an extent that his
mind was incapable of cool reflection, by reason of the fact that de-
ceased was trying to take his wife and child from him, and it was not
necessary to kill to prevent this, as above stated, and the killing oc-
curred simply because of this provocation, it would be manslaughter.
Because of the omission's of the charge in these respects, and the refusal
to give the special requested instructions, reversible error was com-
mitted. We are not prescribing form of charge—only laying down
the principles.

Over appellant's objections, the bloody clothes of deceased were ex-
hibited to the jury. Various objections were urged to the exhibition
of these bloody clothes. Under the peculiar facts of this case, we be-
lieve this should not have occurred. It sometimes becomes relevant
testimony to admit the clothes of a deceased to explain the nature of
the wound or some connecting fact, or to assist in developing the case
in some way. This character of testimony has been the subject of many
decisions, and usually it has been held that their admission was proper.
But in this case there was no necessity for it. It explained no fact
and was relevant to no controverted issue. That deceased was shot by
appellant was an admitted fact. The nature of the wound, the char-
acter of it, its location, and everything in connection with it was clearly
proved; and there was no controversy about it. The admission of the
bloody clothes before the jury could serve no purpose except to inflame
their minds against accused. If it was relevant to any fact, and was
properly admitted, the fact that it may have had an injurious effect
upon appellant's case would not render its admission improper; but the
exhibition of clothes, like any other fact, is admissible or not, as it may
or may not be pertinent or relevant to some issue in the case. These
clothes could explain nothing, and the sole tendency was to create preju-
dice.

Several witnesses were permitted to testify that some three or four
weeks prior to the homicide deceased had been kicked by a horse, and
that one of his ribs had been apparently knocked in. Gay testified in
this connection that he saw deceased a few days before his death, and
as he remembered his appearance, he looked debilitated from an injury
received from a horse throwing and dragging him, and that he looked
injured physically. Witness Hanks testified that a few days prior to
the homicide he saw deceased, and testified as to his physical condi-
tion; and the further fact that he walked "careened to one side;" and
that deceased told him he had been hurt by a horse, and was afraid
one of his ribs was mashed in. Mrs. Hanks testified that she had re-
ceived a card some three or four weeks prior to her father's death, in
obedience to which she went to her father's residence; that she saw her
father's side and it looked like a rib had been knocked in; that her
mother asked her to come and look at her father's side, while she was

putting a bandage with liniment on it; that her father complained of suffering very much with his side. We believe this testimony should have been excluded. These were matters and conversations occurring between parties of a hearsay nature. Certainly if it was relevant to prove the fact that deceased was not in his usual health and strength at the time of the homicide as bearing upon the relative strength of the parties to the homicide, it could not be proved by conversations and expressions of opinion and matters of that sort, occurring between the parties away from defendant. Perhaps it would have been admissible under the circumstances, to prove, if it was a fact, that deceased was not in his usual vigorous health, inasmuch as the size, condition, health and relative strength of the parties was made an issue by some of the testimony. But the conversation and expressions of opinion, as testified to by these parties, were not admissible.

It was an issue in the case as to whether deceased was forcing appellant's wife to remain away from him. And in this connection the issue was injected as to the affections of appellant's wife for her husband. Defendant's theory was that she was an affectionate and dutiful wife, except when otherwise influenced by deceased and his (deceased's) wife; and that she was superinduced to remain from him by the threats and conduct of deceased and wife. The State's theory was that appellant's wife did not love him, and was remaining away from choice and refusing to live with him. In this connection appellant offered three letters written him by his wife during the spring preceding the homicide, while he was in Tom Green County and his wife was at the residence of her father, in which she expressed, in strong terms, her affection for her husband; how much troubled she was in her own mind and feelings about being away from him, and expressing the desire and wish to come and be with him. These letters were rejected. In the attitude in which the case had been placed by reason of the searching investigation of these family matters and acts and conduct of all the parties, and especially of the wife towards the husband, these letters should have been admitted. These were strong facts and circumstances, or might have been, bearing upon the condition of appellant's mind, and would have a strong tendency to explain, in connection with the immediate facts, why it was he carried the gun from the house to the buggy, and why he shot deceased. If deceased was keeping his wife from him, and she was desiring to live with him, and deceased was forcing or undertaking to force the separation and keep them apart, it would have a strong tendency to explain the condition of appellant's mind at the time of the homicide, and his attendant acts and conduct.

Immediately after the shooting appellant stated to his mother-in-law and wife, and just as he was leaving the immediate scene of the homicide, that he would get somebody to come just as quick as he could. Within ten minutes afterwards, he met witness Mask, and remarked to him, "I shot Mr. Hudson down there awhile ago, and I

would be glad if you would go down and get a doctor, and see if they need anything and give them assistance." Appellant further remarked that he was then en route to Glen Cove to get a doctor and send him to Mr. Hudson. Mask promised to secure a doctor. This was res gestae. There was some further conversation between witness and appellant at the time. This testimony was excluded, as also further conversation with this witness to the effect that, if the witness saw the officers looking for him, to tell them that he would return to Coleman and give up as soon as he could get to Glen Cove; and that Mask did see and so informed a deputy sheriff. And he offered the further fact that he tried to go to Coleman to surrender, and was as far in that direction as Collier's, where he remained all night; that he could not get nearer the town of Coleman that night on account of high water; and that he was arrested at Collier's the following morning. And he further proposed to prove in this connection that, after he had been to Glen Cove, he started towards Coleman to surrender. This testimony, on objection of the State, was excluded. We believe it should have been admitted. There were some matters apparently relied on by the State to show flight and evasion of arrest.

Immediately after the shooting appellant drove away, was gone a short time, and returned. While he was returning, the witness Mrs. Hudson was permitted to testify that he came driving back very rapidly, and her daughter said to her, "Run, mamma; run, mamma, and hide; he is going to kill you, for he said he would." Witness replied, "Though he shoot my brains out right here, I will not leave my darling loved one." This conversation occurred between the wife of appellant and his mother-in-law, Mrs. Hudson, after the homicide, and in his absence, and was clearly inadmissible. Numerous exceptions were reserved to the argument and speeches of State's counsel, as well as to the refusal to continue the case. It is unnecessary under the disposition we have made of the case, perhaps, to go into these matters, but if there were no other reversible errors, these would require such action on the part of this court.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*