## I. A. HUEY v. THE STATE.

### No. 4429.  Decided April 18, 1917.

### Rehearing denied June 27, 1917.

**1.—Murder—Clothes of Deceased—Evidence.**

Where, upon trial of murder, the introduction in evidence of the bloody clothes of deceased did not tend to solve any disputed fact, or explain issues about which there was doubt, the same was reversible error. Following Christian v. State, 46 Texas Crim. Rep., 47, and other cases. Prendergast, Judge, dissenting.

**2.—Same—Evidence—Declaration of Third Parties—Hearsay.**

Where, upon trial of murder, the State was permitted to introduce testimony concerning matters and things that were said by the witness to other State witnesses in a conversation between said witness and the other witnesses, as to what occurred at the time of the homicide, and which declarations were made by said witness in the absence of the defendant, the same was reversible error. Following Gonzales v. State, 16 Texas Crim. App., 152, and other cases. Prendergast, Judge, dissenting.

**3.—Same—Rehearing—Facts Stated in Opinion.**

Where the facts stated in the original opinion are correct, except appellant was made to testify to things that another witness testified to, but the matter was of not sufficient moment to affect the court's ruling, there was no reversible error.

**4.—Same—Stating Facts in Opinion—Rehearing.**

Where, upon motion for rehearing, it was contended that the statement in the original opinion, with reference to defendant's carrying his gun to shoot

squirrels and rabbits just before the homicide, was incorrect, but the court's statement was borne out by the record, there' was not reversible error.

### 5.—Same—Evidence—Bloody Clothes—Rule Stated.

Bloody clothing may or may not be admissible in evidence, and this depends upon whether they serve some useful purpose in the elucidation of some issue in the case, or tend to solve some question about which there may be some issue, but where the contention of the State was that the clothes were admitted in evidence to contradict appellant's testimony as to the location of the wound was untenable, in as much as there was no issue about this point, the introduction of bloody clothes of deceased in evidence was reversible error. Prendergast, Judge, dissenting.

### 6.—Same—Evidence—Rule Stated—Opinion of Witness.

While the physical facts surrounding the scene of the homicide may be admissible in evidence, yet a conversation between parties with reference to incidents and matters which are in controversy is not admissible in evidence, in the absence of the defendant, after the homicide. This would be but an opinion of the witness. Prendergast, Judge, dissenting.

### 7.—Same—Evidence—Tracks—Declaration of Third Parties.

Where, upon trial of murder, an issue arose as to where the gun was located with which defendant killed the deceased, and certain tracks were upon the ground, an eyewitness could testify that the gun was located at a certain point, and that he saw the actions of defendant in going to and coming from the gun and the use of it. But these facts could not be testified to by another to whom the first State witness related them, after the homicide and in the absence of the defendant. Prendergast, Judge, dissenting.

### 8.—Same—Evidence—Habits of Deceased.

Where, upon trial of murder, defendant testified that deceased cursed him at the time of the homicide, the State should not have been permitted to show that about a year before the homicide the deceased had joined the church and could not therefore be guilty of swearing.

Appeal from the District Court of Cooke. Tried below before the Hon. C. F. Spencer.

Appeal from a conviction of murder; penalty, ninety-nine years imprisonment in the penitentiary.

The opinion states the case.

*Culp, Culp & Culp,* for appellant.—Upon question of declarations of third parties: Holt v. State, 57 Texas Crim. Rep., 432, 125 S. W. Rep., 43; Seymour v. State, 71 Texas Crim. Rep., 76, 158 S. W. Rep., 304, and cases cited in opinion.

*E. B. Hendricks,* Assistant Attorney General, and *Garnett & Garnett,* for the State.—Upon question of bloody clothes: Cole v. State, 75 S. W. Rep., 527; Crenshaw v. State, 85 S. W. Rep., 1147; Hart v. State, 15 Texas Crim. App., 202.

On question of malice: Marta v. State, 193 S. W. Rep., 523.

DAVIDSON, Presiding Judge.—Appellant was convicted of murder, his punishment being assessed at ninety-nine years confinement in the penitentiary.

It is unnecessary, we think, to give anything like a statement of the facts. The State relied largely upon the testimony of Williams to the effect that when he walked to where the parties were engaged in the difficulty he heard them talking. His testimony and that of defendant is at variance as to who began the conversation that finally led to the trouble. The great preponderance of the testimony shows that the parties were friendly up to the time of the killing, and that appellant was a renter of the deceased. One of the witnesses testified to the effect that appellant expressed some dissatisfaction because deceased did not accompany him to the town of St. Jo on Saturday to assist him in raising some money previous to the homicide on Monday. Deceased was building a fence separating the pasture from the farm land. Appellant and other hands had been assisting him. It is in evidence that deceased, the landlord, was to pasture the stock of his tenants free, among others the stock of appellant. Appellant was asked if he would further assist in building the fence on Monday, to which he assented, and went to the place of the homicide for that purpose, taking a single barrel shotgun. He accounts for taking the shotgun by stating that he would find squirrels and rabbits in passing through some timbered land and would use the gun for the purpose of killing these. When he reached the place of the homicide he laid it down a few steps from the fence in some young corn in which was also growing some Johnson grass. This was about eight to twelve steps from the fence on the south side. Deceased drove up in his wagon on the north side of the fence. A conversation occurred in which deceased informed appellant that he would have to pay fifty cents a month pasturage on his stock or keep them out of the pasture. Appellant reminded him of the fact that the contract was that he was to have pasturage free. A wordy altercation became a little incisive. Deceased jumped out of his wagon with a double-edged ax. Appellant says he got the ax out of the wagon, while Williams says he picked it up from the ground. He drew the ax in a striking attitude, and appellant stepped back and got his gun and approached within a few steps of deceased. Williams says at this time deceased had his ax handle in his hand with the ax part of it down by his leg or side, while appellant says he had it drawn back over his shoulder in a striking attitude. He fired the gun from down by his side without raising it to his shoulder, the load of shot taking effect in appellant's abdomen about two or two and one-half inches to the right of the middle line of the stomach, which resulted fatally. The ax was found about two or three feet from deceased's body, some of the testimony showing it was near his feet. Appellant and Williams both left. Appellant surrendered to the officers, and Williams went around and secured some nearby neighbors and returned to the scene of the tragedy. It seems that the son of deceased had been to the body before these parties arrived. Two other young men were also present. The wound was described as having entered, as before stated, going straight in and about an inch to an inch and a

half in diameter. The gun was loaded with No. 6 shot. This would indicate that the muzzle of the gun was not very far distant from deceased when it was fired. There was no controversy or question as to the wound and that it entered from the front and at the point designated. This did not become an issue and there was no other evidence as to the place of the wound. Appellant made no contention that the wound entered otherwise than in the front, and his contention was further that deceased was facing him at the time with an ax drawn back above and over his shoulder. The testimony describing the wounds is stated because of a bill of exceptions reserved to the action of the court permitting the exhibition of the bloody shirt and pants to the jury while the widow of the deceased was on the witness stand. The bill shows that she was very much affected when the clothes were shown her and while describing them was crying. Exception was reserved to this, and, we think, correctly. Where the production of the bloody clothes tends to solve any disputed fact or explain issues about which there was doubt, they should go to the jury, otherwise they should be excluded. Under these decisions we are of opinion that the court was in error with reference to this testimony, and it comes within the rule laid down in Cole v. State, 45 Texas Crim. Rep., 225, followed in Christian v. State, 46 Texas Crim. Rep., 47; Crenshaw v. State, 48 Texas Crim. Rep., 77; Lucas v. State, 50 Texas Crim. Rep., 219. These are a sufficient number of cases to show the rule as applicable to this bill of exceptions and the action of the court.

There are two other bills practically to the same effect reserved to the introduction of the testimony of the two witnesses who went to the scene of the homicide with Williams. They cover each about a couple of pages of the transcript, setting out conversations and acts occurring between the parties at the scene of the tragedy some time after the shooting but during the same day. These matters were things that were said by Williams and the conversation between himself and these witnesses as to what occurred at the time of the homicide, the location of the parties and various things that he says he saw at the time, to all of which exceptions were reserved for various and sundry reasons. We are of opinion this testimony was not admissible. These were acts, conversations and declarations made in the absence of the defendant among third parties, and in no way binding upon appellant. It is useless, we think, to go into a discussion of this matter. There are quite a number of cases we might cite, among others, Gonzales v. State, 16 Texas Crim. App., 152; Felder v. State, 23 Texas Crim. App., 477; Liner v. State, 70 Texas Crim. Rep., 75; Streight v. State, 62 Texas Crim. Rep., 453; Holt v. State, 58 Texas Crim. Rep., 295, 125 S. W. Rep., 45. The rule is so well recognized it is unnecessary to cite authorities. This illegal testimony may have had and doubtless did have material effect upon the minds of the jury in their finding the amount of punishment.

The court charged upon the issue of manslaughter. There was a

sudden quarrel, starting about not very important matters. The parties became angered and minds inflamed. The deceased made the first demonstration with the ax. The testimony in any event was illegal and improper. The assessment of ninety-nine years in the penitentiary may have been induced by this testimony by giving it undue prominence and weight.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, JUDGE, dissenting.

### ON REHEARING.

#### June 27, 1917.

DAVIDSON, PRESIDING JUDGE.—In the State's motion for rehearing the original opinion is criticised. Among other things, the following quotation is made from the opinion as being erroneous, towit: "A wordy altercation became a little incisive. Deceased jumped out of his wagon with a double-edged ax. Appellant says he got the ax out of the wagon, while Williams says he picked it up from the ground." That a wordy altercation incisive in nature occurred is made evident by the record. It is unnecessary to mention that matter further. The opinion is correct in stating that deceased jumped out of the wagon. This is testified by appellant, while Williams, the other eyewitness, stated that deceased got out of the wagon by first stepping on the brake and thence on the ground. It was Williams who said that the deceased got the ax out of the wagon and not appellant. Appellant stated that after deceased jumped from the wagon he went a few feet and picked up the ax from the ground. Whatever error in the statement from the record is made in the opinion is hereby corrected. The facts there stated are correct, except appellant was made to testify to things that Williams testified and Williams to matters of which appellan testified. Just how this occurred the writer does not know. Doubtless in dictating he placed the parties in that attitude, but that is a matter of small moment.

Another expression in the opinion is criticised by the State in its motion for rehearing. This extract is made from the motion for rehearing: "The court, on the first page of its opinion in this cause, says: 'He (appellant) accounts for taking the shotgun, by stating that he would find squirrels and rabbits in passing, and would use the gun for the purpose of killing these.' The above statement of appellant shows that he was not hunting for squirrels, and the only place in the entire record where rabbits are mentioned is in the court's opinion." Through some inadvertence State's counsel overlooked the testimony of Mrs. Huey. She says: "It was not unusual for him to take that gun with him; he carried it every once in a while. He would carry the gun with him sometimes *to kill squirrels or young rabbits.* In going down there to his work he would go through a branch or

bottom and through some timber. He was in the habit of *killing squirrels and young rabbits* down there." The criticism of the State's motion is not well taken.

The opinion is further criticised as being incorrect in holding that the bloody clothes of the deceased were inadmissible. In the light of this motion we have again carefully reviewed that question and are the more fully convinced we were not in error. Bloody clothing may or may not be admissible, and this depends upon whether they serve some useful purpose in the elucidation of some issue in the case, or tend to solve some question about which there may be some issue; but their admission is to be justified by some reason authorizing their consideration in the solution of doubtful propositions or in elucidating some question arising on the trial. Nor can the State's present contention be sustained, that is, that the clothes were admitted to meet and contradict appellant's evidence and show there were no shot holes in the shirt sleeves of deceased. Such contention was not made on the trial by any testimony called to our attention. The court did not admit the clothes upon the ground that they had any relation to the shirt sleeves or holes in the shirt sleeves. The court says he admitted the clothes for the following reasons: to show the exact place where the deceased was shot, there being only one eyewitness, and he was fifteen to sixteen feet away at the head of deceased's mule team, and in the opinion of the court was necessary on this issue. There was nothing in the case before the jury at the time the clothes were admitted upon which to contradict appellant. It was while the widow of the deceased was on the stand testifying and through her that these clothes were admitted. The bill is quite lengthy and unnecessary to repeat. She was the second witness placed on the stand by the State in making out its case originally. The defendant had not testified, and there was nothing to contradict so far as he was concerned. The court, it would seem from his qualification, admitted the clothes only as bearing upon the location of the wound. There was no question about the location of the wound, and none raised on the trial. Deceased was shot in front with a shotgun at close range, because the shot did not scatter. The wound went in about two or two and one-half inches on the right side from medial line of the deceased's body and through the waistband of his pants. This was the only wound on him. There was but one shot fired. None of the shot entering the body went through. There could be no issue on the question as to the location of the wound on the body of deceased. The clothes were not admitted to contradict appellant, because appellant had not testified. The bill with reference to this matter is rather lengthy and it is deemed unnecessary to embody it in the opinion.

It is also contended the opinion was wrong in holding that some of the matters which occurred between Dike Williams and J. M. Taylor, as shown by the bill of exceptions, when Taylor was taken by Williams to the scene of the tragedy, were inadmissible. The writer has gone

over this matter again in the light of what is said in the motion for rehearing, and the original conclusion, in the mind of the writer, in the main, is correct, concededly evidence of physical facts surrounding the scene of the homicide may be admissible; but the physical facts are one thing and a conversation between the parties with reference to incidents and matters of that sort that are in controversy, is quite a different thing. Williams took Taylor and others to the scene of the homicide and pointed out places which he said the parties occupied, and their movements at the time and place of the homicide. That Williams could testify to this, or that he could take parties to the point of the homicide and show, in a general way, the physical facts, or point them out, may be conceded, but when the State undertakes to show the statements and conversations of Williams and Taylor as to Williams' view of the matters and occurrences, we are of opinion the State went farther than was authorized. Illustrative of this, there was a serious contention on the trial as to the acts and conduct of the deceased and of the defendant. Williams testified, as did appellant, that appellant had his gun lying some steps away in the edge of some young growing corn, and perhaps where there were some Johnson grass. Williams stated at a certain point during the trouble appellant threw down the hammer he had and went for his gun, which was lying off some distance, picked it up, and in a half raised or stooping position shot without taking aim; at least without placing it to his shoulder. There was a contention between appellant's testimony and Williams' as to the distance to the gun and the location of the gun. Williams says at the time appellant got the gun he came back half way from where he picked it up to where he discharged it, and that he never straightened up after picking up the gun. That he was close to the deceased is evidenced by the fact that the shot went almost into a solid load without scattering, into the body of deceased about two and one-half inches from the middle of the front or abdomen, entering through the waistband of his pants. Taylor was permitted to testify that when he went to the scene of the tragedy with Williams that Williams pointed out a place where he said the gun was located, and he, Taylor, in checking up this matter, stepped twelve steps to where Williams said the gun had been located and twelve steps back. There was no evidence outside of the statement of Williams that this was the location of the gun, and there were no physical facts on the ground to show that the gun had been thus located. Taylor states that there was one set of tracks going to where Williams said the gun was and one set of tracks going back. The entire evidence for the State and the defendant, through Williams and appellant, contradicts this. Appellant says he carried the gun down there with him thinking he would find squirrels; that he had no intention of having a difficulty with deceased, and placed the gun six or eight steps from the fence on which they had been working, and went to the fence with a view of going to work. Of course, in carrying the gun to the place it was located there

must have been one set of tracks made going and another coming away. The gun did not get there of itself. It was carried there by appellant. Williams says appellant went to the place where the gun was and picked it up and returned about half way and shot. From any angle of view there is no possibility of escaping the fact that there were two sets of tracks, the first made when appellant carried the gun to the place where it was placed and returned, and the other when he went for it and returned for the purpose of killing or shooting the deceased. There was nothing to indicate that the tracks pointed out by Williams were the tracks of appellant except his statement, and that was made to Taylor. This was a matter occurring between third parties, and Williams could not thus corroborate himself. That Williams could testify that the gun was located at a certain point, and that he saw the actions of appellant in going to and coming from the gun, and the use of it, would be original testimony, but that he could take Taylor and relate these facts to him and have Taylor come in and testify about them from Williams' statement is a different proposition. The writer mentions this in giving his reason why some of the testimony through the witness Taylor was not admissible. The acts and declarations and conversations between Taylor and Williams about these matters are not evidence. It is a conversation and matters occurring between third parties. That tracks upon the ground leading to or coming from a certain place may be admissible is not the question, but when it is sought to connect the defendant with those facts something more is necessary. The man who testifies himself that certain parties made these tracks can not corroborate himself or be corroborated by his statement to other parties as original testimony, and the third party will not be permitted to detail the statement as to the witness' version of the matters as they occurred. If appellant made the tracks testified by Taylor, it is a matter of evidence, but the statements of Williams to Taylor that appellant made these tracks, in the judgment of the writer, are not admissible.

There is another matter about which Taylor testified to which exception was reserved. Appellant testified to the fact that deceased cursed him and used very vigorous language in connection with the swearing. Taylor was permitted to testify that about a year before the homicide deceased had joined the church, and, therefore, had not been guilty of swearing since. The court says he admitted this because deceased had joined the church. The inference could be deduced that, therefore, he did not swear. We are of opinion this testimony of Mr. Taylor was not admissible.

The motion for rehearing is overruled.

*Overruled.*

July 25, 1917.

PRENDERGAST, JUDGE (dissenting).—The evidence clearly shows that I. Huey, appellant, with malice aforethought and without any

shadow of justification, deliberately laid his plans to kill, and did so kill Will Grigsby, deceased. Some three or four days before he killed him he became greatly enraged at him because he, Grigsby, would not go to St. Jo with him and go his surety to borrow money from a bank. Early Monday morning Huey knew Grigsby would that morning go to his field to continue building a fence. Huey took his loaded shotgun, hid it in some growing corn and Johnson grass about twelve steps from where he knew Grigsby would go to work, and when Grigsby reached there Huey went to him and raised a row with him, deliberately walked out twelve steps, got his hidden gun, walked back to within a few steps of where Grigsby was and with a wire fence between them and without any provocation or excuse shot him down and instantly killed him. His own nephew, Dike Williams, was present and witnessed the brutal murder, and was so frightened by it, and by the fact that he feared his uncle, appellant, would also kill him to prevent him from being witness against him that he, Williams, holloaing, ran away. His uncle, appellant, thereupon commanded him to hush and stop. Williams swore: "He had his gun in his hand when he told me to stop, holding it across that way (indicating across the arm). He had his gun in his hands when he told me to hush. The reason I didn't keep on running when he told me to stop, I was afraid he would shoot me."

The evidence as a whole demonstrates this state of facts:

Grigsby was a farmer—owned his farm. Early in 1916 Huey rented some land from Mr. Taylor, near Grigsby's. He had no house to live in. He also then rented some land from Grigsby and thereby secured, and moved into a house of Grigsby. When he rented he had only two head of stock. Later he acquired a pair of mules and a cow and calf. He was enabled to buy these mules to make a crop with by Grigsby going on his note for $250, the price of them. Huey had no means to buy provisions for himself and family to live on while making a crop. About June 15th, Huey wanted Grigsby to go with him to the town of St. Jo and go on his note as surety to a bank so he could borrow money to buy provisions. Grigsby declined to do this. It made Huey very mad. Lewis Grigsby, a son of deceased, learned Huey intended going to St. Jo and wanted to go with him. At the time Lewis did not know Huey wanted his father to go with him, but when Huey so told him, he saw and talked with his father, deceased. He then saw Huey again, and swore: "I told Mr. Huey, 'Papa said he was very busy in his crop and couldn't get to go to St. Jo Saturday, and besides, if I wanted to go, I could save him the trip, because I could go as well as he in the favor that he intended to confer.' I told Mr. Huey that I could go to the bank with him and tell the banker the number of acres of crop and the condition of the same that he had on Taylor's place and in that way help him to get the money. This conversation all took place in the most friendly way, without any thought of any anger or anything, but immediately following this statement

that my father couldn't go to St. Jo, the old man became very angry and just broke out in a fit of rage. When I use the expression 'old man,' I mean Mr. Huey; he was the man I was speaking to—he broke out in a fit of anger and said he could throw up the crop he was making on my father's place and make a living hauling freight. He said, 'I can't make a crop without somebody will give me money to buy provisions and things to work my crop and if I have to let me crop go and grow up in grass, I guess I can make a living hauling freight.' . . . When I told him I would go to St. Jo instead of my father, he said, 'There is no use going at all unless your father will go; they don't lend money out at the banks on wind.' " This was on Thursday before Huey killed Grigsby. Monday morning following, Huey went to St. Jo, it seems, alone and managed in some way to borrow some money from the bank.

The fence Grigsby was building was to separate his cultivated from his pasture land. Huey had helped him some before Grigsby declined to sign his note to the bank. Late Sunday evening Grigsby met Huey near Lewis, his son's, and asked him if he was going to help him on said fence the next morning. Huey replied in a loud and angry tone, "I can help you until dinner." Grigsby said to him: "Well, Mr. Huey, I can't build the fence myself, and if you won't help me, I will have to hire someone to help me build the fence. If you don't think the pasture of your stock is worth a little work on the fence, I will have to ask you to keep the stock out of the pasture or pay pasturage on them." Just then Mrs. Grigsby called to her husband for assistance about her cow and calf, and he left Huey and went to her assistance. Lewis swore: "Mr. Huey made no reply to my father in regard to helping him or paying on the stock; he didn't say which he would do, whether he would help build the fence or pay pasturage on the stock, he just looked at my father right straight and turned and started off, and when he had taken about six or eight steps he half turned and looked back to my father for probably a half minute, looked just right straight at him, then turned, and with his head dropped, started on."

Early Monday morning, while Grigsby was at breakfast Huey sent his seventeen-year-old son to tell, and he did tell, Grigsby "to come down and he would help him build the fence." As stated above, Huey then took his loaded shotgun to where he knew Grigsby would go to work on the fence, hid it some twelve steps off, preparatory to kill him with it, when he did come, and did then and there kill him with it.

Grigsby was a much smaller man than Huey, weighed about 125 pounds, was sixty-two years old, slender and beginning to feel his age considerably. Huey was fifty-nine years old, weighed not less than 165 pounds, and was a stout, able-bodied man.

Said Dike Williams, appellant's nephew, who was present and witnessed the murder, testified that when he got within thirty or forty steps of appellant and Grigsby he heard them talking pretty loud and sorter angry at one another; that it was his uncle, Ike Huey, that he

heard; that he then went up to where the parties were; that Mr. Grigsby was sitting in his wagon behind the dashboard. Williams swore: "When I got up there something was said to me. Mr. Grigsby said, 'Dike, Huey says he has done as much work on the fence as I have.' Mr. Huey then told Mr. Grigsby, 'You are a God damn liar.' Mr. Grigsby then said, 'I am not supposed to take that, Huey, but you are a larger man than I am.' Mr. Grigsby then started off the wagon and Mr. Huey picked up a hammer. Mr. Grigsby stepped out on the brake and from there down on the ground and after Uncle Ike (appellant) picked up the hammer, he reached in the wagon and got out the ax. Mr. Grigsby was a small man. With reference to Mr. Grigsby appearing angry when he stepped out of the wagon, will say he never returned no words; he just got out of the wagon and picked up the ax and threw it on his shoulder like this (indicating throwing ax over shoulder), and turned facing. Grigsby just turned around and was facing Uncle Ike. Mr. Grigsby didn't move towards Uncle Ike. There was a wire fence between Mr. Grigsby and Uncle Ike. My Uncle Ike was on the south side of the fence and Mr. Grigsby was on the north side. Mr. Grigsby was standing right up at the wagon when he got the ax out of it. When Mr. Grigsby picked up the ax and turned around, I guess he was something like two or three feet from the wagon. When Mr. Grigsby turned around facing Uncle Ike with the ax on his shoulder, Uncle Ike threw his hammer down and said, 'I don't allow no God damn son-of-a-bitch to draw an ax on me.' After Uncle Ike dropped the hammer and left there, Mr. Grigsby dropped the ax down something like this (indicating, holding ax with blade down towards feet). When my Uncle Ike said, 'I don't allow no God damn son-of-a-bitch to draw an ax on me,' he turned and went off and Mr. Grigsby dropped the ax down this way (indicating, with handle in hand and blade towards feet). Mr. Grigsby was standing still when he dropped the ax down by his side. While Mr. Grigsby was standing there with the ax down by his side, that is, when Mr. Huey started off. When he started off, he went out southeast and kind of across the corn and he picked up his gun. Mr. Huey went out twelve steps in the corn, is what Mr. Taylor stepped it. I was there and saw Mr. Taylor step it. He walked off twelve steps into the corn and picked up the gun. He then came on back with the gun and shot Mr. Grigsby. I don't know exactly the distance he came back before he shot Mr. Grigsby, but he came back something over half way. Mr. Grigsby was still standing holding the ax when Mr. Huey came back there with the gun and shot him. Mr. Grigsby hadn't moved or changed the position of the ax from the time Mr. Huey turned and went off and got the gun and shot him; he had not moved at all. Mr. Grigsby was standing on the north side of the fence and Mr. Huey was still on the south side of the fence at the time he shot him. Mr. Huey came up with the gun kinder this way (indicating, holding the gun in about a half raised position in front of him) and kinder point-

ing like this and bending over this way (indicating by stooping over) and he never straightened up at all—he was kinder bent over. Mr. Huey fired the gun without putting it to his shoulder."

Dike Williams was a cripple. Some weeks after the killing, Usko, the seventeen-year-old son of appellant, told him "if I would swear that Mr. Grigsby ran at his pa with the ax through the fence, that that would beat the case, and I said, 'Usko, I ain't going to swear no lie, I have a God hereafter to meet,'" and that Usko then threatened to get a club and beat him. On another occasion Usko told him that he did not know that he, Williams, would ever live to testify in the case. Other threats against Williams were testified to by him.

According to appellant's own testimony he tried to make it appear that at the time he shot and killed Mr. Grigsby that Grigsby had an ax drawn on him up over his shoulder. If his testimony had been true on this point it would have necessarily placed Grigsby's forearm in such a position that the shot would have passed through his shirt sleeve on his arm. All this is shown by the testimony and in addition was demonstrated before the court by the State's attorney in arguing the case. It therefore became entirely proper for the State to introduce deceased's shirt so as to demonstrate that appellant's testimony on this point was false, and it therefore was entirely proper, as had always heretofore been held by this court, for the State to introduce the clothes of deceased to demonstrate the falsity of appellant's claim. The fact that Mrs. Grigsby's testimony identified deceased's clothes and their introduction in evidence was proper even though appellant had not at that time testified. The State doubtless knew what his testimony would be and had the right to anticipate and disprove it. The record in no way discloses that the State in argument or otherwise used deceased's clothes in any improper way whatsoever. (2 Branch's Ann. P. C., sec. 1855, where he collates a large number of cases.)

That Dike Williams might point out to the other witnesses on the ground where Huey was when he started off to get his gun and came back about half way and shot and murdered deceased and where deceased stood at the time was unquestionably admissible; and from this information, though given to the other witnesses by Dike Williams, they could, as they did, testify, that they found appellant's tracks going twelve steps after his gun, picking it up and then returning a little over half the distance when he shot and killed deceased, was proper and legitimate testimony, and has always heretofore been held admissible. The bill on this point shows no error whatever.

Without doubt this case should have been affirmed and not reversed. I respectfully dissent.