# CHARLESTON.

## STATE v. CHARLEY WALKER.

### Submitted November 21, 1922.   Decided December 5, 1922.

1. HOMICIDE—*Evidence of Specific Instances of Violence by Deceased Admissible With General Reputation, as Quarrelsome Man; Hearsay Evidence of Specific Acts of Violence by Deceased Inadmissible Unless Part of Res Gestae.*

   In the trial of a homicide where the accused relies upon self defense, and there is appreciable evidence to support his theory, the accused may prove the reputation of deceased as a dangerous and quarrelsome man, and if accused has personal knowledge of specific instances of unwarranted violence by deceased against other persons he may testify thereto, in addition to testifying to the general reputation of the deceased in that regard; but it is not error to refuse to permit him to testify of what he has heard, concerning such specific acts of violence, from others, unless such acts are so closely connected with the homicide as to be a part of the *res gestae.* (p. 503).

2. CRIMINAL LAW—*Cross-Examination Tending to Discredit Witness Other Than Accused Within Court's Discretion.*

   Whether a witness, other than the accused, in a criminal case must answer questions propounded on cross examination which tend to disgrace or degrade him for the purpose of affecting his credibility, but which are not material to the facts in issue, is within the sound discretion of the trial court, largely subject to the personal privilege of the witness if claimed, and if such witness, without claiming personal privilege, is required to answer such questions, it will not be error unless it is clear that the accused has been prejudiced thereby. (p. 506).

3. HOMICIDE—*Where Reputation of Policeman as Dangerous Man is at Issue, Evidence of Reputation Where He Discharged Duty Also Admissible.*

   Where the reputation of a policeman as a dangerous and quarrelsome man is in issue, evidence thereof should not be confined to the locality in which he lives; evidence of those who know such reputation where he discharges his duty may be received. (p. 509).

4.   SAME—*Refusal of Instruction That Deceased Policeman Must
     be Considered as Private Citizen Because Act Leading to
     Homicide Not Discharged in Official Duty Not Error.*

   Where a policeman has been killed while patrolling his
   beat and in the discharge of his duties, it is not error to refuse
   instructions which tell the jury that they must consider the
   policeman as a private citizen in arriving at their verdict
   because the policeman an hour or so before the homicide and
   not in the discharge of his duty had commanded and required
   a girl to leave the street after 9 o'clock at night and go to
   her place of lodging, over which action of the policeman an
   altercation then arose between the slayer and the policeman,
   and as a result of which the subsequent homicide was com-
   mitted.   (p. 510).

Error to Circuit Court, Kanawha County.

Charley Walker was convicted of murder in the second de-
gree, and from an order denying his petition for writ of
error to the circuit court, he brings error.

*Affirmed.*

*S. B. Avis* and *T. C. Townsend,* for plaintiff in error.

*E. T. England,* Attorney General, *R. Dennis Steed,* Assist-
ant Attorney General, and *B. J. Pettigrew,* for the State.

LIVELY, JUDGE:

Charley Walker was convicted of murder in the second de-
gree in the intermediate court of Kanawha County, on Febru-
ary 16, 1921, and sentenced to confinement in the penitentiary
for eighteen years.   He petitioned the circuit court for a
writ of error, which was refused, and he prosecutes this writ.

Defendant is a negro, and was indicted, tried and convicted
for the murder of Flem Anderson, who was a negro police-
man of the city.   The accused relied upon self defense.   At
the time of the homicide defendant was operating a fruit
store or soft drink stand on Court street, and in the early
part of the evening of the 29th of August, 1920, a contro-
versy of not a very serious character arose between the police-
man and defendant over the presence there of a girl named
Katherine Shelton, who had stepped into defendant's place

of business. It was raining slightly at the time, and defendant had loaned the girl a raincoat as she started to go to her place of abode, a short distance away, and deceased, the policeman, took her by the arm as she came out of defendant's place of business and told her to go home, some of the witnesses stating that he told her she was under arrest, and led her across the street. Defendant protested with the policeman, and said that he would take the girl home, but the policeman told him to go back. Defendant then stated that he would go home with her and bring the coat back, but the policeman took it off her shoulders and threw it back at him and told him to go back, and there is some testimony of defendant's witnesses that the policeman at that time drew his revolver and ordered defendant to go no further. Defendant did go back to his place of business, and it is well established that at that time he procured a pistol which was behind the counter, he says in his money drawer, and made some effort to follow the policeman, making some remark to the effect that the matter should be then settled. This is denied by defendant. About 11 o'clock defendant and a companion, "Sunny" Peterson, left his place of business, going in the direction of No. 711 on Court Street, one of the places where he usually slept, and claims that he perceived the policeman standing on the same side of the street which he was traveling, at a police call box, and in order to avoid him crossed to the other side of the street, and thence up the side walk to the corner of Court and Fry streets. He says that the policeman came across the street from where he was standing when he first observed him, and arrived at the corner of Court and Fry streets about the same time that he and his companion came to that corner, when the policeman asked him what he had said about himself, the policeman, to Mathews, another policeman; whereupon, defendant replied that "I told him you had not treated me right", or words to that effect, when the policeman changed his mace from the right to the left hand, and attempted to draw a revolver from under his coat with his right hand; whereupon, he grabbed the right wrist of the policeman and a scuffle ensued, in which the pistol was

discharged, and thinking his life was in danger he then drew his own revolver and killed the policeman, shooting him two or three times. He then took the policeman's pistol, and fled down an alley. The alarm was raised, and several persons pursued him. He presented his revolver to some of those who pursued, and ordered them to stand back. It was about three o'clock in the morning when he sent word to a policeman that he would give himself up. Evidently, defendant was alarmed at the threatening attitude of the crowd, which had assembled at the place of the shooting. This evidence of the defendant was in the main corroborated by "Sunny" Peterson.

On the other hand, the state introduced witnesses who testified in effect that the policeman was standing at the corner of Court and Fry streets near a post, when defendant and his companion approached him and shot him down. There was some evidence that defendant had made threats against the policeman after the first incident about the girl, Katherine Shelton, herein detailed. The jury evidently believed the witnesses for the prosecution, and found defendant guilty of murder in the second degree.

An outline of the testimony has been detailed in order to intelligently discuss the points of error which are relied upon for reversal.

The assignments of error are: (1) It was error to refuse to permit defendant's witnesses to testify concerning the shooting of a negro, by the policeman, some days before the homicide in question; it was error to refuse to allow the defendant to state if he had heard of any specific instances or any specific shooting that had been made, which would lead him, defendant, to think he (the policeman) was a dangerous and quarrelsome man; and to refuse to allow defendant to state that he had received information, a short time before the homicide, that the deceased had shot a colored man out there without any cause or excuse. (2) That it was error to permit witnesses for the defendant, over his objections, to answer questions concerning convictions of offenses which did not affect their truth and veracity, such as gambling, assault,

unlawful cohabitation, and selling intoxicating liquors. (3) That the court should have permitted defendant to show that deceased bore the reputation of being a dangerous and quarrelsome man in the neighborhood in which he did police duty in the city, by witnesses who did not know his reputation in this respect in the neighborhood in which he lived. (4) That it was error to refuse to give defendant's instructions, Nos. 12, 13 and 14.

It is claimed in the first assignment of error, (a) that the lower court should have permitted witnesses for defendant to testify concerning the shooting of a negro man by the policeman a short time before the homicide on trial; (b) that the court erred in not permitting the accused to testify of specific instances of violence on the part of deceased, brought to defendant by information, and especially to testify as to the specific instance of deceased having shot a negro man in that vicinity, without any cause or excuse, also through information received. The only witness for the defendant who was asked concerning his knowledge of the shooting of a colored man, by the policeman, was the defendant himself; the other witnesses who were asked concerning this matter were character witnesses introduced by the state for the purpose of showing that the policeman bore a good reputation as a peaceable and quiet man in the neighborhood in which he lived, and on cross examination they were asked if they had not heard of this specific instance. These character witnesses for the state were Marshall Morris, J. H. Blount, R. O. Mitchell, Dr. John E. Cannaday, J. M. Craigo, and Joe Kent. Counsel has not designated any witnesses who were refused to so testify, and from our examination of the record we have found none except the above.

Was it error not to allow Charley Walker, the defendant, to testify that he had heard of this specific instance of shooting by the policeman some days prior to the homicide? To sustain this proposition of error we are cited to our recent case of *State* v. *Hardin*, 91 W. Va. 149, 112 S. E. 401. In the Hardin case we decided that in cases of this character where self defense is relied upon, and there is evidence tend-

ing to support the theory of defense, defendant should be allowed to testify to specific acts of violence of deceased against other parties which were within his knowledge. That proposition of law seems to be reasonably well settled. In the instant case, it is sought to show that the accused had heard of such specific instances of violence. A number of witnesses for defendant had testified that the policeman was a quarrelsome and dangerous man, and that he bore that reputation in the communities where he had lived, and also in the city of Charleston where he then resided. The defendant himself had also testified that the deceased bore that reputation and that he knew it. The questions above set out, which he was not permitted to answer, relate, not to specific instances of violence which were within his own knowledge, but to a specific instance of which he had been informed. No doubt, in learning of the policeman's dangerous and quarrelsome character this specific instance had been detailed to him, possibly much overdrawn, as is usual in rumors of that character. The object of character evidence of the deceased, where self defense is relied upon, is to show the mental attitude of the accused at the time of the homicide, and to some extent excuse him, if he acted hurriedly in protecting himself from the assaults of a man whom he knew to be dangerous. In this case, the accused had the benefit of that character of evidence. He was allowed to say, which was proper, that he knew that his alleged assailant was dangerous and quarrelsome. Specific instances of violence cannot be introduced to show a general reputation in that regard; and it is reasonably well settled that specific criminal acts at other times, affecting other people than the slayer, which have given the deceased his bad character, are incompetent. If such instances could be adduced there would be evidence to rebut, and the issues would be numerous, and detract from the one being tried. There might be specific instances of violence in the life of the deceased which upon investigation would turn out to be justified, and eminently proper, and to open the door of investigation of such acts would interminably lengthen the trial and confuse the jury with irrelevant issues. It will be

observed that the question propounded the accused brings into
the case whether the policeman "shot a colored man out there
*without any cause or excuse.*" The impression was sought to be
made before the jury that the policeman had so acted without
good cause. It is true that the accused may have heard such
rumors, or had information to that effect, but it must be re-
membered that it was hearsay evidence, and under the well
established rule hearsay evidence is not generally permitted.
The principle here sought to be invoked would open the door
to all kinds of rumors which an accused had heard or which
he had imagined he had heard. There is abundant authority
for refusing such hearsay evidence, in cases of this character.
*Alexander* v. *Commonwealth,* 105 Pa. St. Rep. 1; *People* v.
*Dowd,* 127 Mich. 141; *Eggler* v. *People,* 56 N. Y. 642; *Dupree*
v. *State,* 33 Ala. 380; *State* v. *Elkins,* 63 Mo. 159; *Fitzhugh*
v. *State,* 81 Tenn. 258; *McKenna* v. *The People,* 25 N. Y.
(18 Hun) 580; *Garrett* v. *State,* 97 Ala. 18; *Moulton* v. *State,*
88 Ala. 116; *Thomas* v. *The People,* 67 N. Y. 218; *People* v.
*Farrell,* 137 Mich. 127. In the last case cited it was said,
"But it is well settled that it is not admissible to show specific
acts of violence committed by deceased upon third persons,
in nowise connected with or observed by the accused, on the
ground that such matter is too remote, and, if proof were
admitted, so, also, would repelling evidence, and the side
issues thus raised would be as numerous as the offenses im-
puted to the deceased." Citing *People* v. *Dowd,* 127 Mich.
143. In *State* v. *Roderick,* 77 O. St. Rep. 301, it was held (2d
pt. syl.) : "In general the mode of proving the violent and
dangerous character of the deceased is by showing that such
was the general reputation of the deceased in that community
and at that time and that such reputation was known to the
defendant; but the defendant can not be permitted to prove,
for the purpose of showing reasonable ground for apprehen-
sion of bodily injury or loss of his life, particular instances
of violence or viciousness on part of the deceased, which did
not concern the defendant and at which the latter was not
present and of which he has no personal knowledge." Where
the specific acts of violence tending to show the dangerous

character of the deceased are so connected with the facts and circumstances attending the homicide as to be a part of the *res gestae,* such specific acts may be shown in evidence where the accused relies on self-defense. Even although the accused might not have observed or been informed of such specific acts, they tend to show the state of mind of the deceased at the time of the homicide. *State* v. *Waldron,* 71 W. Va. 1. But where such specific or isolated acts form no part of the *res gestae,* and in no way connected with the defendant, they will not be received in evidence, 21 Cyc. 910. We do not think the trial court erred in refusing to allow the accused to testify about what he had heard concerning the detailed specific act of deceased which had no connection with the homicide on trial. Witnesses for the State, Marshall Morris, John H. Blount and others, who testified to the good reputation of the deceased policeman as a peaceable man, were asked if they had not heard of the specific instance referred to, and were not permitted to answer. As above suggested, general reputation is not controlled or formed by one act. *Hussey* v. *State,* 87 Ala. 131. Even if these witnesses had heard of such shooting, it had not affected the general good reputation of the deceased. The record does not disclose what their answers would have been. There is no averment that the witnesses would have said, if permitted, that they had heard of the shooting, and that it was without lawful justification or excuse There is much authority to the effect that a witness who has testified in a criminal case that the general reputation of the accused as to being a peaceable and law abiding man was good, cannot be asked on cross-examination whether he has heard rumors of the accused having been connected with former criminal acts. *Aiken* v. *People,* 183 Ill. 183; *State* v. *Dickerson,* 77 Ohio St. 54, 11 A. & E. Ann. Cas. 1181.

On the second assignment of error, which relates to cross-examination of witnesses for the defendant, concerning their prior convictions of offenses against the law, we are not directed by counsel to the particular witnesses who were required so to state. Again, we have gone through the record for this purpose, and find that Katherine Shelton, who was

the girl referred to as the "Cat" girl, and the one over which the inception of the difficulty seems to have occurred, was asked if she had not been convicted in police court for gambling, on the 3d day of May, objection to which was interposed and overruled, and she answered that she had not been convicted; likewise, she was asked if she had not been convicted of unlawful cohabitation, in police court, on the 28th day of October, 1920, objection was interposed and overruled, and her answer was that she had not been. She was also asked if she had not been charged with this offense, and if she had not been convicted of loitering, objection was interposed, and the objection sustained. As to this witness, we cannot see wherein the defendant was prejudiced. The state was bound by her answers. Jake Jones was asked if he had not been convicted of adultery and fornication in police court, and answered that he had not been; he was asked if he had not been convicted of gambling, and his reply was, "Oh, I guess so, for gambling, I don't know how many times." Ella Royals was asked if she had not been convicted of gambling, in police court, and answered that she had not been; that she had been arrested once, but had not been found guilty of any charge. Andrew Ambler was asked on cross-examination if he had not been convicted of a violation of the prohibition laws, in Fayette County, and his answer was that he had been found guilty in one or two instances. He was also asked if he had not been storing stolen goods in a building at the corner of Fry and Court streets in the city of Charleston, and answered that he had not. Spencer Moore was asked if he had not been convicted in police court of assaults, one upon Jennie Clark, and the other upon John Conne, and he answered in the affirmative. All of these questions were objected to by counsel for defendant, but the court permitted answers. The proposition whether a witness on cross-examination can be compelled to answer questions where the answers will tend to degrade or disgrace the witness, but not to incriminate him, has given rise to considerable conflict in the decisions in the various states. We are cited to our case of *State* v. *White,* 81 W. Va. 516, to sustain the

proposition that a witness will not be compelled to answer questions which tend to degrade him as affecting his credibility, in which *State* v. *Grove,* 61 W. Va. 698; *State* v. *Miller,* 75 W. Va. 591; *State* v. *Sheppard,* 49 W. Va. 582; *State* v. *Hill,* 52 W. Va. 296; and *Uhl* v. *Commonwealth,* 6 Gratt. 706, are cited. All of these cases are where the *accused* has been asked such questions, and they hold that it is improper to admit such evidence reflecting upon him, in the absence of any effort on his part to prove good character. By going on the witness stand he has not opened his reputation for general good character to an attack. Those cases are different from that we have here, where the questions are propounded to witnesses for the accused. The distinction is noted *State* v. *Miller,* cited, where the accused being a party as well as a witness, the objection of his counsel was said to be equivalent to a claim of privilege on his part, and the court should have excluded the questions. See *Fletcher* v. *State,* 49 Ind. 124; *State* v. *Beckner,* 194 Mo. 281. This point of error was discussed by Judge POFFENBARGER in the case of *State* v. *Prater,* 52 W. Va. 132, where a number of authorities are reviewed. The witness always has the personal privilege of declining to answer such questions unless they relate to relative and material matters, that is, those which are material to the facts in issue on the trial. "Subject to the right of the witness to claim his personal privilege, it is in the sound discretion of the court to exclude or permit such cross-examination, and the exercise of such discretion is not reviewable, except in cases of manifest abuse or injustice." Opinion, *State* v. *Prater,* p. 151. In sec. 830 of Jones on Evidence will be found a review and discussion of the various views of text writers on evidence, and the decisions, upon this question. This author says that the conflicting authorities have only one point in common, and that is, the unfailing refuge in the discretion of the court. Starkie says: "The principle on which such evidence is admissible is clear and obvious; the reason for excluding it is extrinsic and artificial, and it may be added, but theoretical." Starkie, Evidence, 212. Wharton seems to hold that the witness ought not in such cases be com-

pelled to answer. Wharton's Evidence, 541. Jones, after reviewing the various texts and decisions, says: "But, although the later decisions on this subject, like the earlier ones, cannot be reconciled, there is a decided tendency toward greater liberality in allowing questions of this character, and toward leaving the matter largely within the discretion of the trial judge. See also 40 Cyc. p. 2570, title "Extent of Cross Examination." Did the trial judge abuse his discretion in permitting these witnesses to answer in this particular case? Evidently, the court and prosecution knew that a number of them were police court characters. Such being the case, they would be more liable to testify strongly for the defendant in a case where the actions of an officer of the law were involved. They were friends and patrons of the accused, whose place of business seems to have been under police surveillance. The trial court evidently concluded that the character of this class of witnesses should go to the jury as affecting their credibility. Under the circumstances, we do not think the lower court abused its discretion.

On the third assignment of error, namely, that the court should have permitted the defendant to show that the deceased bore the reputation of being a dangerous and quarrelsome man in the neighborhood in which he did police duty in the city, by witnesses who did not know his reputation in this respect in the neighborhood in which he lived, we find that but one witness, Arthur Woodward, was not permitted so to testify, and that was after he had already done so without objection on the part of the state. Counsel does not refer to any specific witness, and in our search of the voluminous testimony we have found only one, Woodward, and it appears that he was permitted to testify that the policeman bore the reputation of being a dangerous and quarrelsome man in the neighborhood where the shooting was done, which was on the policeman's beat. This witness was then asked if he knew the general reputation of deceased in the community in which he lived, and his reply was that he did not know where the deceased lived. He was then again asked if he knew his reputation in the community where he served, to

which he answered in the affirmative, and the court, upon objection of the state, did not permit him to testify again to that which he had previously testified. The court properly refused to permit the witness to repeat his testimony. We find no basis for this assignment of error. Witnesses both for the state and the accused were permitted to testify to the general reputation of deceased as a peaceable and law abiding man, and as a dangerous and quarrelsome man, in the city of Charleston generally and in the various places where he had lived before he came to the city, and the reputation of the deceased in that regard was thoroughly placed before the jury as contended for by prosecution and defense.

The remaining assignment of error is to the refusal of defendant's instructions, Nos. 12, 13 and 14. These instructions are to the effect that the policeman was not in the discharge of his official duty when he took the girl "Cat" by the arm and made her go to her home, (or to where she lodged), from defendant's place of business, and that defendant, in interfering with the policeman at that time, was not doing an unlawful act, and therefore the deceased was not entitled to any more consideration at the hands of the jury than if he was a private citizen, and that they should consider and think of deceased in the capacity of a private citizen only. Can we say as a conclusion of law that the policeman was not acting in an official capacity and not discharging an official duty in making this girl get off of the streets at that time of night? Her occupation and livelihood were apparent. But, whether the policeman was within or without his official duty in protecting public morals and enforcing orderly and decent conduct of those on his beat, the instruction would tell the jury that he was to be considered as a private citizen at the time he was killed an hour or so after. He was patrolling his beat in the discharge of his duty at the time of the homicide, and to instruct the jury that he should then be considered as a private citizen would be error.

We affirm the judgment.

*Affirmed.*