# CHARLESTON.

STATE v. HARRY W. PORTER.

(No. 5206.)

Submitted February 17, 1925.     Decided March 10, 1925.

1.  CRIMINAL LAW—*New Trial Not Granted for Prejudice or Juror,
    Unknown to Accused Until After Verdict, Unless Accused
    Suffered Injustice.*

    A new trial will not be granted in a criminal case for matter
    that is a principal cause of challenge to a juror, which existed
    before he was selected and sworn as such juror, but which was
    unknown to the prisoner, until after the verdict, and which
    could not have been discovered by the exercise of ordinary
    diligence, unless it appears from the whole case that the
    prisoner suffered injustice from the fact that such juror served
    upon the case.  (p. 398).

    (Criminal Law, 16 C. J. §2650.)

2.  HOMICIDE—*Dangerous Character of Deceased Proved by Gen-
    eral Reputation in Community, and that Such Reputation
    was Known to Accused; Accused Cannot Prove Particular
    Instances of Violence by Deceased Which Did Not Con-
    cern Accused and of Which he had no Knowledge.*

    In general, the mode of proving the violent and dangerous
    character of the deceased is by showing that such was the
    general reputation of the deceased in that community and
    at that time and that such reputation was known to the
    defendant; but the defendant cannot be permitted to prove, for
    the purpose of showing reasonable grounds for apprehension of
    bodily injury or loss of his life, particular instances of
    violence or viciousness on the part of the deceased, which did
    not concern the defendant and at which the latter was not
    present and of which he had no personal knowledge.  (p. 401).

    (Homicide, 30 C. J. §§397, 470.)

3.  CRIMINAL LAW—*Specific Acts Tending to Show Dangerous
    Character of Deceased Part of Res Gestae of Homicide, If
    Accused Relies on Self-Defense.*

    Where the specific acts of violence tending to show the
    dangerous character of the deceased are so connected with
    the facts and circumstances attending the homicide as to be
    a part of the *res gestae*, such specific acts may be shown in
    evidence where the accused relied upon self-defense.  (p. 401).

    (Homicide, 30 C. J. §588.)

4.  WITNESSES—*Showing Witness for Accused Was Charged by Separate Indictment With Accused for Same Murder, Competent.*

It is competent to show 'that a witness for defendant was charged by a separate indictment together with defendant for the same murder to show his bias or interest.   (p. 401).

(Witnesses, 40 Cyc. p. 2065 [1926 Anno.])

5.  CRIMINAL LAW—*If Instructions as Whole State Law Correctly, Verdict Will not be Disturbed Because Some Instruction Standing Alone Might Mislead Jury.*

Instructions to the jury must be taken and read as a whole, and, if, being so read and construed, they state the law correctly, and do not misstate it in any particular, and no proper instruction, asked for, has been refused, the verdict will not be disturbed on the ground that additional proper instructions could have been given, or 'that some particular instruction, standing alone, might mislead the jury.   (p. 407.)

(Criminal Law, 16 C. J. §§2493, 2501.)

6.  SAME—*Instruction Presenting Abstract Principle of Law Relevant to Evidence is Not a Cause for Reversal, if Jury Could not be Misled Thereby.*

The giving of an instruction presenting an abstract principle of law, relevant to facts in evidence, is not cause for reversal if read in the light of the other instructions in the case the jury could not be misled by it.   (p. 407).

(Criminal Law, 16 C. J. §§2493, 2501.)

7.  SAME—*Instruction That Oath Imposes on Juror no Obligation to Doubt, Where no Doubt Would Exist if Oath Had Not Been Administered, not Reversible Error.*

An instruction containing the clause: "The oath of a juror imposes on him no obligation to doubt where no doubt would exist if no oath had been administered" is disapproved, though the giving of it is not reversible error.   (p. 407.)

(Criminal Law, 16 C. J. §2406.)

8.  HOMICIDE—*Whether Shooting Was Induced by Previous Grudge or Result of Immediate Provocation is for Jury.*

Where there has been a previous grudge and also an immediate provocation, it is for the jury to determine whether the shooting was induced by the previous grudge or the result of the immediate provocation.   (p. 411).

(Homicide, 30 C. J. §584.)

9.  SAME—*If Intent to Take Life is Executed After Deliberation,
    Though But for an Instant, Offense is First Degree Mur-
    der.*

    It is well settled that, if intent to take life is executed
    after deliberation and premeditation, though but for a mo-
    ment or an instant, the crime is murder in the first degree.
    (p. 411.)

    (Homicide, 29 C. J. §97.)

10. SAME—*Evidence Held Not to Make Killing Voluntary Man-
    slaughter as Matter of Law.*

    This is not such a case as the appellate court can say that
    the evidence brings it within the degree of voluntary man-
    slaughter as a matter of law.    (p. 412.)

    (Homicide, 30 C. J. §396.)

    (NOTE: Parenthetical references by Editors, C. J.--Cyc. Not part
          of syllabi.)

Error to Circuit Court, Cabell County.

Harry W. Porter was convicted of first degree murder,.
and he brings error.

*Affirmed.*

*W. T. Lovins,* and *Poffenbarger, Blue & Dayton,* for plain-
tiff in error.

*E. T. England,* Attorney General, and *R. A. Blessing,.*
Assistant Attorney General, for the State.

WOODS, JUDGE:

Harry W. Porter was tried for the murder of Charles
Golden Jordan, in the Court of Common Pleas of Cabell
County, at the April term, 1924.  He was convicted of first
degree murder and sentenced to life imprisonment.  His mo-
tion for a new trial was denied by the trial court.  He pe-
titioned the circuit court for a writ of error, which was re-
fused, and he prosecutes his writ here.

Porter and his wife had lived in Huntington for some time.
Ethel, the wife, owned a taxi-cab business and Porter helped
her to conduct it.  She drove taxi-cabs herself and was about
the office much of the time.  Jordan came to Huntington in
the latter part of the year 1923.  He became acquainted with

and is said to have paid attention to Porter's wife. There is considerable evidence concerning this intimacy, and the feeling engendered between deceased and defendant because of it. The homicide admitted, occurred on the 12th of March, 1924, about 3 o'clock in the morning. At the trial the defendant relied upon self-defense.

On the evening of the homicide, sometime near 11 o'clock, Ethel was informed that her husband was at Bettie Church's, and shortly after midnight she also went there. On being told her husband was up stairs, she went up to where he was in Bettie Church's room. She found Bettie sick and the doctor there. While she, her husband and the doctor were in Bettie Church's room, Jordan arrived, together with Gibson and Kelly, both taxi drivers of the Rose Taxi, and Jordan asked for Ethel. Lillian Dean, a girl living at the house, called Ethel down stairs. There is a sharp conflict in the evidence as to just what happened at this time. While Lillian and Ethel contend that Jordan drove Ethel from the house at the point of a gun, and compelled her to go away with him; Gibson, states that he never saw a gun; that Lillian told him (Gibson), as she and Ethel came down, if he saw Harry coming down to let Ethel know; that Ethel went into the room where Jordan was waiting; that she talked two or three minutes to Jordan, laughed, turned and walked out the side door; that a few moments later, Jordan stepped out to the driveway, where Ethel was waiting with the car door open; and that they drove off together. Lillian Dean testifies that she went upstairs and told Porter: "Jordan has got Ethel and made her leave, he has got a gun. You go and protect Ethel and protect yourself." Porter left the house at once. Porter states that he went to his taxi office, got a .38 Smith & Wesson Special and cartridges; went to the Rose Taxi office, asked Lafferty if he had seen his wife, and received a negative answer. Lafferty testifies that Porter did not make any inquiry as to his wife, but inquired concerning Jordan, and that he said: "I heard that Jordan was looking for me with a pistol. I am going to kill him on first sight. I am not going to give him a chance with me." Porter denies this, saying, "I told Elzie (Lafferty) that I was

going to hunt Ethel and if Jordan was with her, I was going to take Ethel and I was prepared to protect myself.'' According to Porter, he again went to his office and from there again to Bettie Church's to inquire if Ethel had been there since he left; he returned to his office, where he was told by Moore, one of his drivers, that Ethel had just called in, stating that her car was stalled at the foot of 22nd Street, and requesting some one from the garage to come and pull the car out of the mud. Moore started to take Porter to relieve his wife. They found Jordan on a street corner a couple of blocks up from the river front. Moore inquired of the whereabouts of Ethel; Jordan denied any knowledge of her whereabouts, and stated that he had a car stuck at the foot of 22nd Street. Moore started to drive on, when Porter, on looking back, saw a wrecking truck approaching 22nd Street. He told his driver to turn and see if Jordan got on the truck. They passed just as Jordan got on the truck, then turned again and followed the truck down a few blocks, until it turned off to another street and went back in the direction of the City. Porter testified that he failed to see his wife's car out on the river bank and decided to follow the wrecking truck back to the City. From another witness it seems that this truck returned to the Fourth Street garage to get chains. At one of these stops, little eleven year old Gertrude Mathews, at No. 2131 Washington Avenue, heard a conversation between one whom she recognized by an impediment in his voice to be Porter and another, in which the unknown person said: ''You had better not do that you will get put up; they'll put you up!'' and to which Porter replied: ''I don't give a damn, I am going to kill him before morning, if it is the last thing I do''; and then they drove off. Porter states that they returned to the taxi office, inquired for Ethel, and was told she had not returned; they then went to the Fourth Avenue garage, where they heard men getting chains out and some one (he took it to be Jordan's voice) say, ''That there was going to be a free-for-all down on the river bank.'' Smith, the truck driver, testified that he (Smith) made such a statement to the boys in the garage but was only ''kidding.'' Porter further states that he and Moore then hurried back

to the taxi office for a 25-20 rifle and a box of cartridges. They again started out in the car, which it was shown had no side curtains up, and ran out of gas; 'phoned for another car, and Lear Lester came with another Cadillac, with curtains up. Porter got in the front seat, Moore in the rear, and Lester drove the car. They recognized a Buick from the Rose Taxi approaching. Porter directed Lester to let it pass, but it did not pass. Porter's car stopped, so did the Buick, and a few words passed between Porter and Jordan. Porter's car resumed the trip, and likewise the Buick. Porter's car now turned into Washington Avenue, headed East; he ordered it stopped again. The car stopped this time directly in front of house No. 1051, Washington Avenue, and on the same side of the street. The Buick came to a stop on the opposite side of the street. Jordan called to Lear Lester, to come over and asked if he was sure Harry was going to pull Ethel out of the mud hole, or whether he was looking for him. Lester informed him that Porter was going for Ethel. Jordan then asked Lester to tell Porter to come over, to which Porter replied that he didn't have time to fool with him. Jordan got out of his car and came over to the front left-hand side of the Cadillac, which was open. Gibson, Jordan's driver, and the only other occupant of the Buick, moved his car up about forty feet and stopped, let the motor run, and didn't hear anything until shots were fired a few seconds later. Jordan inquired of Harry if he was looking for him, and receiving a negative answer, continued, according to Lester's testimony, "It looks to me like you are; you are following me around all night." Moore, who occupied the rear seat of Porter's car, testified: "He (Jordan) said, 'You (Porter) have been bragging and blowing around what you are going to do * * * * * You think because you have killed a man or two'—I am not sure that he said 'Killed a man or two.' He either said 'Killed a man' or 'Killed a man or two'—I am not sure just which, 'You can get by with it. You've been living on your past reputation, and you think you are a bad man just because you get by with two or three things. You don't look a bit bad to me!'" According to the same witness, Porter replied, "All right, let them search me and you

and let's get out here and fight it out." Deceased then applied many vile names to defendant and dared him to shoot; and Porter told Lester to come on and drive on, that Jordan was just a "big blow" or something like that; that Jordan walked back to the car, that a few remarks followed, and that Jordan said: "Don't you raise that gun! * * * or I'll kill you." At this time witness Moore dropped down behind the seat and the shooting occurred. Lear Lester, who, during the quarrel, had been standing by the back left fender, states that Jordan kept his hand in his overcoat pocket, that he said something about wanting to fight, and that Harry replied, "You have got a gun, let them search us. I'll fight you a fair fight." Lester did not see the shooting, having hid behind a telephone pole fifteen or twenty feet behind the car. Three occupants of house No. 1051, which stood back about forty feet from the street, in front of which defendant's car was parked, were attracted by the altercation. They testified on behalf of the State. Thomas Worley, looking out from his upstair's window, saw the car in front of the house, saw a man's head over the top of it. Heard this man say, "Harry you have been following me around all evening," and also heard him ask him to get out. That the man in the car replied. "You have got a gun!" to which the man in the street said, "You have got two guns. Put down that gun, Harry! Don't pull that gun on me; put it down!" He also testified that the shooting began from the inside of the car, and that five or six shots were fired. C. D. Stewart, another occupant of the same house, from his door, saw a man midway between the cars, and heard about the same argument, and heard five or six shots fired. Nannie Worley, wife of Thomas Worley, saw a man walking toward the car with hand in pocket and heard him say that, "You have been following me all night," and also, "Drop that gun" or "Put it down" twice—then the shooting began. Mrs. Bennett, at No. 1040 Washington Avenue, was awakened by the profane language of both parties; and G. W. Withrow, who was at the same house, saw a man backing down and saying, "Don't do that! Don't do that!" and then the gun cracked. Porter testifies: "As he (Jordan) raised his gun, I started to

empty the gun. I just pushed it as I emptied it. \* \* \* \* I just followed him with the gun until it was empty. \* \* \* \* He ran around the car and I thought I heard about two shots that sounded different than mine. I knew he must have more shells in it. He had run around to shoot from the car at me, so I jumped out and grabbed this rifle and stood there on the side of the car. I hollered to some of them to pull the car up.'' Witness Worley testified further that after the shooting the man came back and fell between the car and sidewalk; that he threw up his hands; and that he saw nothing in them. Stewart could see both hands of the man on the ground until he got to the front seat; was looking to see if he had anything in them, but didn't see anything in them; saw car door open and a man get out; one lying on ground. Moore states that he and defendant got out on opposite side from Jordan and went to the rear of the car. Lester states that he came back to the car when shooting was over; that Jordan was lying on his back in gutter by curb, and a pistol beside his right hand. Porter further states that when they pulled the car up he could see Jordan plainly; that he put his rifle back in the car and stood in his tracks and called for Fat Gibson to get out of the car and come back and look at the pistol; he also told Moore this. Porter also told these two to stay by the body and not let anybody touch it while he and Lester went to police headquarters. Moore states that Porter walked up, kind of put his hands on his knees, bent over and said: ''It is no use; he is dead,'' in reply to someone who said, ''Take him to hospital.'' Mr. Worley saw a man come back and stoop over the fallen man ''fumble around like'' and say: ''He has got a gun on him boys, come over here and look at it.'' The same witness saw two other men come up. Lester, after moving the car, at Porter's request, came back and heard a similar statement. Gibson and Moore stated that Porter walked over to the Buick and told him (Gibson) to come over and ''see the gun.'' Nannie Worley saw a man get out of the car and bend over the fallen man, going through his clothes, raise up, and call others to come and see. Mrs. Bennett saw men walk up, something shiny in their hands. Saw two men, the tall one lay something shiny down

by dead man where right arm would be. Then big man came to the door to 'phone. This man was Gibson. Withrow heard statement "You had better go quick." Gibson saw revolver lying next to right front pocket under overcoat. Defendant and Lester then got in the Cadillac and headed East. The chief of police on taking charge of the dead body, searched the clothes of Jordan and found a pawn ticket for a revolver, calling for a .38 Colt's revolver, blue steel, with pearl handles, and on presenting the ticket at the pawn shop, it was found that Jordan had pawned the weapon at Albert's Place in Huntington, on the 6th day of March, and that it was still there in pawn on the night of the homicide. The defense introduced several witnesses who testified that they had seen Jordan with a gun sometime before midnight. Of the nine witnesses who testified to the incidents of the shooting, the defendant alone testified to seeing a gun in Jordan's hand at the time of the altercation.

While the record is voluminous, yet we think this is a sufficient statement of the evidence to render intelligible the rulings herein made. More of the testimony will be detailed and commented upon later in this opinion. The prisoner, in support of his motion for a new trial filed certain affidavits, to the effect that some days before the trial commenced, A. L. Gilbert, one of the jurors, who tried the case had stated to the affiants, or in their presence, that if he were on the Porter jury that tried the case he would be in favor of hanging him or sending him to the penitentiary for life; one of the affiants stating that the juror had said that Porter ought to suffer this punishment because he had killed too many men, that he had killed one man with a hame, and that he had killed another man in Michigan. On the hearing of the motion, the State produced the juror who had thus been assailed, who testified under oath that he had never made any of the statements attributed to him by the affiants, or either of them. He was cross-examined by counsel for the prisoner. He stated that he had never made up or expressed any opinion as to the guilt or innocence of the defendant prior to the time that he was placed in the jury box to try the case. The affiants did not testify. It appears from the examination of

juror Gilbert on his *voir dire* that he was not sensible of any bias or prejudice against the prisoner; that he had not expressed an opinion as to his guilt or his innocence; and that he could go into the jury box, if selected as a juror in the case, and give to the defendant a fair and impartial trial according to the law and the evidence. The question here raised is not a new question in our State. In *State* v. *McDonald*, 9 W. Va. 456, a juror stated on his *voir dire* that he had not made up or expressed any opinion as to the guilt or innocence of the prisoner; and that he had not been a member of the grand jury that found the indictment against the prisoner. After the conclusion of the trial, however, it was discovered by the prisoner's counsel that this juror had in fact been a member of the grand jury that found the indictment and that he had voted for the finding. Yet the Court refused to grant the prisoner a new trial on account of the misconduct of this juror, although no explanation whatever was made of such misconduct. In *State* v. *Greer*, 22 W. Va. 800, upon a motion to set aside a verdict, the prisoner filed affidavits showing that a juror had on one occasion before the trial expressed the opinion that the defendant ought to be hung for the murder for which he was later tried. On appeal, in both the aforementioned cases, this Court held that the lower courts did not err in refusing to set aside the verdict on account of the misconduct of these jurors, although the affidavits filed by the prisoners in each case were wholly uncontradicted. In *Probst* v. *Braeunlich*, 24 W. Va. 356, the first point of the syllabus is as follows: "It is settled in this State, as a general rule, with but few, if any exceptions, that the testimony of jurors will not be received to impeach their verdict." On motion to set aside the verdict in the case of *State* v. *Maier*, 36 W. Va. 763, on grounds similar to those urged in the instant case, Judge Holt approves the holding in the *Probst* case in the following language: "If the testimony of jurors, given under oath, will not be received to impeach their verdict, for a much stronger reason the unsworn, ill-considered, and thoughtless statements of jurors, made to third persons, should not be so received." In this case juror Gilbert denies under oath the mis-

conduct attributed to him.  The question thus presented by the conflicting affidavits is one of fact to be passed upon by the trial judge, whose finding sustained the credit and statements of the juror.  Under the authorities we have cited we would not be justified in setting aside the verdict on that ground.

The objections to the rulings of the trial court in reference to the admission and rejection of testimony will now be considered.

E. C. Lafferty, a witness for the State, on cross-examination, was asked for the purpose stated of showing the character of the deceased for violence and turbulence, whether or not he was one of a party of four who went from West Virginia to Pittsburgh, for the purpose of getting a load of moonshine liquor, and that while he was in Pittsburgh, one Laura Hall was killed by a gun-shot wound fired from a gun in the hands of the deceased.  The objection to this question was sustained.  Counsel for the prisoner made the avowal on the record that had he been required to answer, his reply in respect to Jordan would have been in the affirmative.  Is this testimony competent?  In *State* v. *Hardin,* 91 W. Va. 149, it is held that where self-defense is relied on to excuse the homicide, it is competent for the defendant to prove the character or reputation of the deceased as a dangerous and quarrelsome man; and if the defendant has knowledge himself of specific acts of violence by deceased against other parties, he should be allowed to give evidence thereof.  Note that this applies to the defendant and not to the witnesses in his behalf. The witness here testified in respect to his own conduct and part in the transaction inquired of, the only part rejected by the court was the specific act of violence on the part of the deceased.  In *State* v. *Walker,* 92 W. Va. 505, the Court quoted approvingly, *People* v. *Farrell,* 137 Mich. 127, the rule:  "It is well settled that it is not admissible to show specific acts of violence committed by deceased upon third persons, in no wise connected with or observed by the accused, on the ground that such matter is too remote and, if proof were admitted, so, also, would repelling evidence, and the side issues thus raised would be as numerous as the of-

fenses imputed to the deceased.'' In *State* v. *Roderick,* 77 Ohio St. Rep. 301, it was held (second point of syllabus): ''In general the mode of proving the violence and dangerous character of the deceased is by showing \* \* \* the general reputation of the deceased in that community and at that time and that such reputation was known to the defendant; but the defendant cannot be permitted to prove, for the purpose of showing reasonable grounds for apprehension of bodily injury or loss of his life, particular instances of violence or viciousness on the part of the deceased, which did not concern the defendant, and at which the latter was not present and of which he had no personal knowledge.'' Where, however, specific acts of violence tending to show the character of the deceased are so connected with the facts and circumstances attending the homicide as to be a part of the res gestae, such specific acts may be shown in evidence where the accused relies on self-defense. *State* v. *Waldron,* 71 W. Va. 1; *State* v. *Alderson,* 74 W. Va. 732. But where such specific or isolated acts form no part of the res gestae, and are in no way connected with the defendant, they will not be received in evidence. 21 Cyc. 910. We do not think the trial court erred in refusing to allow the witness to testify about the specific acts of the deceased which had no connection with the homicide on trial. The evidence of Clay Williams, who testified on behalf of the defendant, concerning specific acts of the deceased occurring some months previous to the homicide, on which he based his opinion solely as to deceased's being a dangerous man was properly stricken from the jury under the rule announced above.

Dilliard Moore, a witness for the defendant, while testifying before the jury, was asked by the State the question on cross-examination: ''You are still indicted for conspiracy with Harry Porter and a man named Lester for killing Jordan, are you not?'' To which he replied, over the objection of the defendant, ''Yes sir.'' This is alleged to be error. 2 Wigmore on Ev., sec. 967, states the rule: ''When a co-indictee testifies for the accused, his situation here may also be considered as tempting him to exonerate the other accused and thus help him toward his own freedom.'' *State* v. *Titus,*

(Ala.) 23 So. 77, held that it was competent to show that a witness for defendant was charged by separate indictment with the same murder. The Court in its opinion said: "It was competent to show that one who had been introduced as a witness for defendant, was then charged by separate indictment for the murder of deceased; and, if she had denied that she had knowledge of such a charge, it would have been competent to have proven the fact in any legitimate way, and for this purpose the indictment itself might properly be introduced. This evidence, however, was not competent to establish the guilt of the defendant who was then on trial, but only to affect the credibility of the witness." To the same effect, *State* v. *Wilkerson*, (Ala.), 37 So. 265; *Clifton* v. *State*, 73 (Ala.) 473. In *Shaw* v. *State*, (Ga.), 29 S. E. 477, it is held that where upon a trial of one person jointly indicted with another for a felony, and that other is introduced as a witness for the person on trial, it is competent to introduce as impeaching testimony the record of his indictment. To like effect, *McCray* v. *State*, (Ga.), 68 S. E. 62. In the latter case the Court said: "An indictment is a mere charge of accusation by the grand jury and is no evidence of guilt. * * * The sole purpose for which it was admissible was to show that [the witness] had been indicted in connection with [defendant] for a part of the same transaction about which he testified, so that the jury could consider whether his testimony was given in the light of that fact and of the fact that he was subject to trial under the indictment, and whether his testimony was biased thereby." It will be observed that this question is distinguished from where a witness is propounded questions the answer to which would tend to degrade him. The question alleged as error here by counsel for defendant is an exception to the rule and is permitted for the purpose of allowing the jury to judge to what extent, if any, the witness is interested in the result of the particular case. If two persons are indicted for the same offense, and it should appear from the evidence that from the acquittal or conviction of one even a slight inference of the guilt or innocence of the other could be drawn or that the fact of one would have any probable bearing, however remote on that of the other,

and one should testify either for or against the other, under such circumstances it is proper to ask the witness whether he was under indictment for the same offense.

Another assignment of error is that the State was permitted to put in evidence, over the objection of the defendant, that Lillian Dean, a witness for defendant, had been arrested a few months before the time of the homicide, for loitering for immoral purposes and that she had been fined therefor. Also Dr. Gerlach, State Health Officer, was asked by the State if she was ever brought to him by anyone for examination and treatment for venereal disease. The doctor declined to answer upon the ground that it would bring up the relation between physician and patient, and was therefore privileged. At this point the State, by the prosecuting attorney, moved the Court to strike out all said evidence in relation to Lillian Dean. This motion the Court sustained, instructing the jury on motion of Mr. Via, one of counsel for defendant, as follows: "You heard the statement of counsel for State, gentlemen, that they move to strike out the evidence of Dr. Gerlach and Strobel Fulweiler. That evidence goes out and the jury will not consider it. That is not in this case at all." The prisoner complains that although this evidence was stricken from the consideration of the jury, the fact that it had been permitted, tended to prejudice the jury against the testimony of the witness. Under the rule announced in the recent case of *State* v. *Walker*, 92 W. Va. 499, the State could on cross-examination have inquired of this witness concerning the matters later introduced in evidence, and did do so. The proposition whether a witness on cross-examination can be compelled to answer questions where the answers will tend to degrade the witness, but not incriminate him have given rise to considerable conflict in the decisions of the several States. In *State* v. *Praeter,* 52 W. Va. 132, it is held that subject to the right of the witness to claim his personal privilege, it is in the sound discretion of the Court to exclude or permit such cross-examination, and the exercise of such discretion is not reviewable, except in cases of manifest abuse or injustice. Jones on Ev., sec. 830, after reviewing the various texts and decisions lays

down, the rule: "But, although the later decisions on this
subject, like the earlier ones, cannot be reconciled, there is a
decided tendency toward greater liberality in allowing ques-
tions of this character, and toward leaving the matter largely
in the discretion of the trial judge." Whether counsel for the
State were mistaken in their right to introduce evidence to
contradict the witness on matters to which we have decided
they had a right to inquire, does not appear on the face of
the record. It would be most reprehensible on the part of
counsel for the State to introduce evidence before a jury
tending to discredit a witness, which they knew to be im-
proper, with a view of later moving its withdrawal from the
jury. Nothing, however, appears on the face of the record
to impugn their good faith, both on its introduction and its
withdrawal. The Court struck it from the jury, and at the
instance of the defendant, instructed them in no uncertain
words to wholly disregard it. We see no error in this action.

Another objection goes to the refusal of the Court to per-
mit W. R. Bird, a witness for defendant, to state that the
State's witness, Charles Smith, told him "I ought to have
allowed you (meaning the witness on the stand) to have
sent an officer with me when you proposed to do so." Charles
Smith was the driver of the wrecking truck sent out from
the Fourth Avenue Garage to the relief of Ethel Porter in
her car trouble over on the river front the night of the mur-
der. Bird testified to certain conversations he had with
Smith both before and after the killing. The contradiction
sought here to be made by the proffered testimony would be
on a purely collateral matter, and therefore plainly im-
proper.

Complaint is made further that certain testimony of one
Robert Stinson, a witness for the prisoner, was stricken from
the jury. The substance of this evidence is embodied in
the following answer of the witness: "He (Jordan) was in
my office one evening; we were playing checkers. He said
he and Ethel (Porter's wife) were parked over on Charles-
ton Avenue and Harry (Porter) came along and stopped a
little piece ahead of him, and then went on back to the office,
he supposed to be the office. Then he went on to his room

and got to thinking about it, that possibly Harry would beat up on Ethel, he got his gun and went down there to Harry's office to see that he didn't do it. That is the whole conversation.'' The witness testified that this conversation took place in November (what year does not appear). The most favorable view to take of the matter would fix the time of this conversation as having taken place over four months before the homicide. If there is an implied threat in the words used by the deceased, it would be admissible. The construction placed on the statement by the witness was that it was not a threat. It is doubtful if it can properly be said to be a part of the res gestae. It tends to show the intimacy of the deceased with Porter's wife. Likewise it also shows Porter's knowledge of this intimacy. To show this knowledge so long a time prior to the fatal combat would be of doubtful value to Porter in this Court in his claim that he was moved by sudden passion at the alleged detention of his wife on the fatal night. While this may be proper testimony, as a part of the res gestae, the fact that divers other witnesses testified to actual threats made by the deceased against the prisoner, and the doubtful evidential value of this particular testimony leads this Court to adopt the conclusion that its exclusion is not prejudical to the prisoner, and therefore not reversible error.

We will now consider the assignments of error relating to the instructions. Seven instructions presenting the theory of the case from the State's standpoint, and all the instructions, nine in number, requested by the defendant were given. The defendant's instructions covered every phase of the law applicable to self-defense. The complaint of the defendant goes to instructions four, five and seven given for the State. Instruction No. 4 tells the jury in effect that mere words, however ''insulting or opprobrious'' they may be, will neither justify or excuse, the person to whom such words are addressed, to commit even an assault upon the person using such words, and that as a matter of law where a homicide has been committed with a deadly weapon, proof of mere words, however ''insulting or opprobrious,'' is not sufficient provocation to reduce it to manslaughter; and that if the

defendant, armed with a deadly weapon, shot and killed the deceased because of such "insulting or opprobrious" words only, then the defendant is guilty of murder unless from all the evidence he is entitled to acquittal on the ground of self-defense. Is there evidence on which to base this instruction? Abusive language was used by the deceased toward the prisoner, and vile epithets applied to him in the quarrel which terminated in the killing. The first paragraph of this instruction finds support in *State* v. *White,* 81 W. Va. 516, point 3 of the syllabus: "Where a homicide has been committed with a deadly weapon, proof of mere words, however insulting or opprobrious, is not sufficient provocation to purge the crime of malice and reduce it to manslaughter." Again it is held in *State* v. *Crawford,* 66 W. Va. 114, that words alone, however insulting or contemptuous, are never sufficient to reduce murder to manslaughter, at least where a deadly weapon is used. The Court in the opinion in this case said: "The nearly universal rule is that, when the evidence shows an intent on the part of defendant to kill, no words of reproach, no matter how grievous soever, are provocation sufficient to free the party killing from the guilt of murder; nor are indecent, provoking actions and gestures, expressive of contempt or reproach, without an assault upon the person, especially when a deadly weapon is used in the killing." Wharton on Homicide, sec. 173; *Allen* v. *U. S.* 164 U. S. 492; *Read's case,* 22 Gratt. 924. This instruction is approved in Sackett's Inst. to Juries (2nd Ed.) 681. In the recent case of *State* v. *Murphy,* 89 W. Va. at page 421, the Court held: "It is quite well established that no provocation arising from mere words, however violent or insulting, would reduce a homicide to voluntary manslaughter. * * * There must be some actual affray, some physical encounter which excites passion to constitute such provocation." It is claimed that the instruction under consideration calls special attention to part only of the evidence and the facts which it tends to prove, and disregards other evidence relative to the matter in issue. The instructions to the jury must be taken together. *State* v. *Driver,* 88 W. Va. 481. It is not necessary to insert in each separate instruction all the exceptions, limitations

and conditions which are inserted in the instructions as a whole. *State* v. *Dodds*, 54 W. Va. 289. Instructions to the jury must be taken and read as a whole, and, if, upon being so read and construed, they state the law correctly, and do not misstate it in any particular, and *no proper instruction, asked for,* has been refused, the verdict will not be disturbed on the ground that additional proper instructions could have been given, or that some particular instruction, standing alone might mislead the jury. *State* v. *Kellison*, 56 W. Va. 690.

It is claimed that instruction No. 5 is a mere abstract proposition of law. The correctness of the principle is not denied. "The giving of an instruction stating an abstract principle of law in a criminal case is not an error, unless the principle stated is. erroneous." Sackett's Inst. Juries, sec. 179. While the better practice is to refuse such instructions the giving of them is not necessarily cause for reversal. *Easter* v. *Railway Co.*, 76 W. Va. 383. Threats of the deceased against the accused have been shown in evidence in the instant case. This instruction states a proposition of the law which is indisputably correct. It cannot easily be moulded into an instruction applying the law to the facts. It is plainly relevant to facts in evidence. Read in the light of the other instructions in the case the jury could not have been misled by it.

Instruction No. 7 is attacked on the ground that it releases the jurors from the obligation or sanction of their oaths, by telling them that the oath imposed upon a juror no obligation to doubt where no doubt would exist if no oath had been administered. We are aware that this instruction has been criticised in some of our decisions, notably *State* v. *Taylor*, 57 W. Va. 228, where it is held: "An instruction, containing the clause: 'The oath of a juror imposes on him no obligation where none would exist, if no oath had been administered,' should be refused, though the giving of it is not reversible error." However, this instruction is ably defended by Judge BRANNON in *State* v. *Hood*, 63 W. Va. 187, in the following characteristic, forceful words: "Complaint is made of * * * an instruction of the State defining reasonable doubt and containing the clause, 'The oath of a

juror imposes upon him no obligation to doubt where no doubt
would exist if no oath had been administered.' * * * It is.
instruction No. 4 in *State* v. *Bickel,* 53 W. Va. 599, and was
held no error in that case. We do not think this is error. We
find this test in many of the cases. It is put in note on page
491 of 12 Cyc. An oath does not compel a juror to doubt when
he would not have a doubt on the same evidence as an honest
man acting in a grave matter. The great Chief Justice Gibson,
a polar star in judicial decisions, said that a juror is 'not at
liberty to disbelieve as a juror while he believed as a man."
*Com.* v. *Harmon,* 4 Pa. 270. Of course, he meant on the evi-
dence, not outside the evidence. Also I find that it is not error
in *State* v. *Kellison,* 56 W. Va. 690.'' While *State* v. *Worley,*
82 W. Va. 350, and *State* v. *McCausland,* 82 W. Va. 525, dis-
approve of this instruction, this Court has not gone to the
extent of holding that the giving of such instruction con-
stitutes error for which the case will be reversed.

It is earnestly contended that the Court erred in not set-
ting aside the verdict on the ground that, as a matter of law,
under the state of facts disclosed, the accused could not be
guilty of an offense higher than voluntary manslaughter;
that a sudden intentional killing with a deadly weapon, by one
who is not in any way at fault, in immediate resentment of
a gross provocation is prima facie a killing in heat of blood,
and, therefore, an offense of no higher degree than voluntary
manslaughter. *State* v. *Clifford,* 59 W. Va. 1. To support
this contention the claim is made that a husband whose wife
has been abducted by another has the legal right to go to her
and relieve her, and if he kills the abductor while the latter
is detaining him on a highway and preventing him from
doing so, he cannot be guilty of a higher offense than volun-
tary manslaughter. *Alford* v. *State,* 8 Tex. App. 525; *Cole*
v. *State,* 45 Tex. Crim. 225, 75 S. W. 527; *Comm.* v. *Drew,*
4 Mass. 391; and others. This is not the theory on which
the State built its case—deliberate and premeditated murder.
Nor is it in accord with the prisoner's line of defense in the
trial court. He relied upon self-defense. He maintained
that he did not seek—that in fact he declined combat. He
seeks in this Court now to engraft a defense that he did not

invoke in the trial court. What was the effect of the supposed abduction of the wife upon the mental state of the prisoner? Was the killing in a sudden heat of passion over the alleged detention of his wife by the deceased on the night of the homicide? Let the prisoner answer in his own words as they appear in the printed record:

"A. I didn't kill Jordan for any of his conduct with my wife. I killed him there to keep him from killing me, when I saw he was trying to kill me.

Q. I understand that your defense is self-defense?

A. That is absolutely the truth."

That Porter knew of the attentions that the deceased had been giving to his wife for sometime before the homicide is borne out by the testimony of not only himself, but by his witnesses. Lear Lester stated that before Jordan went to Pittsburgh in January that he heard Harry tell Jordan to stay away from his garage. This is even before Dilliard Moore, another of Porter's taxi drivers, had heard Jordan say on the Pittsburgh trip, "that he would steal Porter's wife, if he had to kill him to do it." The wife, Ethel, admitted on the witness stand that she had been out with Jordan frequently, after she had first known him in December before; that when Jordan called for a taxi-cab "she usually drove him."

"Q. You and Jordan had some rides together?

A. When Mr. Jordan called for a car I drove him. Whenever he would call up and want me to drive him, I would drive him."

Lena Sayre, a woman of questionable character, also admitted on cross-examination by the State that she had been "out at night with Jordan and Ethel" in the car. These attentions of Jordan to the wife of the defendant would account for the defendant's statement in evidence that he had "told Jordan to stay out of his office." This was some weeks prior to the homicide. Was then the killing of Jordan by de-

fendant the result of sudden passion over the actions of Jordan in connection with the wife on the evening of the homicide or was it the result of premeditation born of dislike and past wrongs? Did the prisoner's conduct, at, immediately preceding, and following, the fatal moment show evidence of a man whose mind was beclouded with passion? In relating what took place at the time Porter said: "I knew Jordan had been planning to kill me and that he wanted me just to make one move toward him and he would do it. So I would not move out of the car and he called me all kinds of cowards and all those things and I did not say a word. I was just letting him go on." Consider the calm manner of the accused getting out of his car, after the shooting, walking over to the dead body, putting his hands on his knees, and leaning forward and looking down into the face of his fallen foe. Adopting the contention of the defense, about which there is a conflict of evidence, that it was Jordan's gun lying by his side, how careful was Porter in this awful hour to call the attention of Jordan's driver to the gun. " 'See the big gun he pulled on me.' I knew he was a friend of Jordan and that is why I wanted him to come down there and look at it and afraid that if I went away he would steal it." Then immediately thereafter when the service car went over to his wife's car where it was stalled in the mud, Porter said "Leave that car alone as it is. I had to kill Jordan a few minutes ago. I want the Chief of Police to see where it (the car) was." Do these actions indicate the existence of sudden passion and heat of blood? Is it not a significant fact that the defendant purchased fifty shells for the revolver used in the affray at five o'clock the evening before, many hours preceding the time that his wife left Betty Church's in company with the deceased? Aside from the threat testified to by witness Lafferty, and the one heard by little Gertrude Mathews from her upstair's window a short time before the affray, both of which Porter denies making, he brings into the case by his own witness the statement of the dead man: "You've been bragging and blowing around what you are going to do, or something like that." These words were spoken in the altercation preceding the shooting. Thus,

98 W. Va.

"Guiltiness will speak though tongues were out of use." Was the defendant's act in assaulting the deceased the result of the fresh provocation or antecedent malice? In *Read's case*, 22 Gratt. *supra*, it is held for the jury to determine whether the shooting was induced by previous grudge or immediate provocation. This would seem to be in harmony with the principles of our criminal law, which leaves all matter of fact to the determination of the jury. McClain on Criminal Law, sec. 330, after referring to this rule says it is for the jury to say whether the killing was the result of previous malice or of a subsequent provocation or necessity. This rule was approved in *State* v. *Clark*, 51 W. Va. 466, the Court saying in its opinion, "The question clearly belongs to the jury and the Court could not invade its province. It could not exclude from the jury consideration of the old grudge in connection with other circumstances of the case."

"When time has intervened between the date of the provocation and the date of the killing, the question whether the killing was done in the heat of blood is for the jury, and if they find the defendant guilty of murder in the first degree, thereby negativing the existence of passion and heat of blood at the time of the killing, the Court cannot disturb the verdict under the circumstances of the case." *State* v. *Beatty*, 51 W. Va. 233. It is well settled that, if the intent to take life is executed after deliberation and premeditation, though but for a moment or an instant the crime is murder in the first degree. *State* v. *McPherson*, 114 Iowa 492; *Fahnestock* v. *State*, 23 Ind. 231; *Howard* v. *State* (Tex.), 58 S. W. 77; *Robinson* v. *State*, 71 Neb. 142. The decisions all show that a jury is the unfailing refuge of the husband who takes the life of a man who violates his home, either with or without his wife's consent, upon the first knowledge of the fact, where a *bona fide* case is made. Juries in such cases are quick to reduce the homicide to manslaughter, if not to excuse him. The question under the authorities of whether the defendant's act was the result of antecedent malice against the deceased or the result of sudden provocation traceable solely to the influence thus engendered, is a question for the jury under all the circumstances in the case. The jury has spoken by

their verdict. This is not such a case as the appellate court can say that the evidence brings it within the degree of voluntary manslaughter as a matter of law.

The last ground relied on for reversal is that the evidence did not warrant the verdict. In 14 Ency. Pl. & Pr. 780, it is laid down that a trial court can weigh conflicting evidence and grant a new trial, but the appellate court cannot. In *State* v. *Cooper*, 26 W. Va. 338, the Court said: "In Virginia and in this State the courts have always guarded with jealous care the province of a jury. If the question depends upon the weight of testimony or inferences and deductions from facts proved, the jury, not the court are exclusively and uncontrollably the judges." To the same effect, *Grayson's case*, 6 Gratt. 712; *State* v. *Betsall*, 11 W. Va. 743; *State* v. *Baker*, 33 W. Va. 335; *State* v. *Morgan*, 35 W. Va. 260; *State* v. *Hunter*, 37 W. Va. 744.

Further comment, or resume, of this testimony is unnecessary. There has been stated under other heads only a fraction of the many facts and circumstances appearing in the many hundred pages of the record. Twelve fair and impartial jurors, in obedience to the solemn oaths they had taken, and who heard all this testimony, saw the witnesses testify, and observed their demeanor, found the defendant guilty. Two learned and experienced judges approved the verdict. Their verdict and their judgment should stand.

*Affirmed.*